IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

FILED-CLERK
U.S. DISTRICT COURT

02 JUL 25 PM 4:59

TX EASTERN-BEAUMONT

BY _Francy Chatman_

| | |
|---|---|
| BEAUMONT FIREMEN'S RELIEF | § |
| AND RETIREMENT FUND, A TRUST | § |
| CREATED UNDER THE TEXAS LOCAL | § |
| FIREFIGHTER'S RETIREMENT ACT, | § |
| ARTICLE 6243e, TEXAS REV. CIV. STAT. | § |
| | § |
| VS. | § CIVIL ACTION NO. 1:02-CV-00214 |
| | § |
| CALLAN ASSOCIATES, INC. and | § JUDGE HOWELL COBB |
| ARM CAPITAL ADVISORS, INC. | § |

## PLAINTIFF'S THIRD AMENDED ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Beaumont Firemen's Relief and Retirement Fund, a Trust Created

Under the Texas Local Firefighter's Retirement Act, Article 6243e, Texas Rev. Civ. Stat., Plaintiff

herein complaining of Callan Associates, Inc. and ARM Capital Advisors, Inc., hereinafter referred

to as Defendants, and makes and files this their Third Amended Original Complaint and in support

hereof would show unto the Court the following:

1.

This is a civil action for damages brought pursuant to Title 28 U.S.C. §1332, in that

there is diversity of citizenship between Plaintiff and Defendants, and the amount in controversy,

exceeds the sum or value of SEVENTY-FIVE THOUSAND AND NO/100 ($75,000.00)

DOLLARS, exclusive of interest and costs.

24

2.

Plaintiff is an organization located in Jefferson County, Texas and at all times relevant to this suit, a citizen of the State of Texas with its principal place of business in the State of Texas whose members are citizens of the states of Texas, Louisiana and Missouri.

3.

Defendant, Callan Associates, Inc., has appeared and answered herein and is properly before this Court and is being provided a copy of this Third Amended Original Complaint by and through its attorney of record. Defendant Callan Associates, Inc., is a California corporation with its principal place of business in California. It is therefore a California citizen for the purposes of determining diversity jurisdiction.

4.

Defendant, ARM Capital Advisors, Inc., has appeared and answered herein and is properly before this Court and is being provided a copy of this Third Amended Original Complaint by and through its attorney of record. Defendant ARM Capital Advisors, Inc. is a Delaware corporation with its principal place of business in New York.

**NATURE OF CASE**

5.

Defendant Callan Associates, Inc. (hereinafter "Callan") is an entity engaged in providing certain investment consulting services to organizations who have retirement plans.

6.

Defendant ARM Capital Advisors, Inc. (hereinafter "ARM") is an entity engaged in the investment of funds in the capital markets for others.

Plaintiff's Third Amended Original Complaint - 2

7.

Plaintiff was a client of Callan and ARM. In 1986, Plaintiff hired Callan to consult with regard to its entire retirement asset fund and subsequently entered into a written management agreement to do so. See Exhibit "A."

8.

Callan, over time, consulted with Plaintiff about specific firms to manage select portions of the fund. One of these, Defendant ARM, was to oversee a very conservative aspect of the portfolio, made up of investments intended to stabilize the portfolio.

9.

Plaintiff, at Callan's suggestion, entered into an agreement with ARM on September 16, 1996, for them to manage the fixed income portion of their portfolio. See Exhibit "B."

10.

Defendant ARM was to act as an agent for Plaintiff in the investment of their pension funds. Defendant ARM owed a duty to exercise reasonable care in the management of Plaintiff's accounts and investments.

11.

Initially, Plaintiff was assured by Defendant Callan that Plaintiff's fixed income investment with ARM would be in investment grade securities and diversified.

12.

Despite Defendant Callan's reluctance to do so, upon realizing Defendant ARM had not managed the fund's assets as contracted, Plaintiff terminated their association with Defendant ARM and liquidated the portion of the fixed income portfolio as was possible, at a substantial loss.

## FIRST CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY OF CALLAN ASSOCIATES, INC.

13.

Plaintiff would show, as stated above, that a fiduciary relationship existed between Plaintiff and Defendant Callan.  Plaintiff and Defendant Callan maintained a confidential relationship which included the reliance on one another to perform as agreed.

14.

The breach of the fiduciary duties occurred when Defendant Callan breached its agreement to provide adequate independent investment consulting services with respect to the management of the Plaintiff's assets as contemplated.

15.

Specifically, Plaintiff alleges that The Fund relied heavily on Defendant Callan for advice as to choosing, monitoring and whether to retain managers of its pension fund.  Plaintiff was presented with options for its fixed income manager by Callan and was persuaded to use ARM in 1996 by Callan employee, agent or vice-principal, Bill Badger.  When Plaintiff expressed concerns at ARM's performance at subsequent quarterly meetings which were held between the Plaintiff and Callan, it was only suggested by Bill Badger that an "eye should be kept on the situation" but nothing else was done about the problem.

16.

Additionally, Plaintiff was encouraged by Callan to reduce the investment quality mandate in its fixed income portfolio to accommodate the downgrades seen in ARM's portfolio rather than to maintain the initially higher standards and deal with the fund management problem.

It is believed that part of the reason for Callan's position on this matter is that ARM and Callan had a business arrangement that created an inherent conflict of interest for Callan.

17.

Plaintiff further states that only after being questioned several times about the sub par results of the ARM fixed income portfolio, and only after large losses were sustained by the Plaintiff in ARM investments, was ARM terminated as Plaintiff's fixed income manager.

## SECOND CAUSE OF ACTION
## BREACH OF CONTRACT OF CALLAN ASSOCIATES, INC.

18.

Plaintiff realleges and adopts by reference all of the allegations of the foregoing paragraphs and further alleges:

19.

Plaintiff would show that Defendants are in violation of their contractual duties, more particularly set forth in the Contract for Consulting Services which is attached hereto as Exhibit "A" and the Statement of Investment Objectives and Guidelines attached as Exhibit "C." Specifically, Callan was to provide independent consulting services to Plaintiff. Plaintiff alleges conflicts, as previously plead, were in existence between Callan and ARM, viz-a-viz the Plaintiff, which resulted in Callan's services not truly being independent.

20.

Moreover, with respect to Callan, this Defendant was contracted with and paid a fee for, among other things, helping to select appropriate fund managers as well as to provide quarterly performance analysis and to advise Plaintiff accordingly. Plaintiff alleges that to the extent that these services were rendered, they were inadequate. Plaintiff was pacified at quarterly meetings by

Callan's representative, Bill Badger, who assured them he was keeping abreast of the ARM investments, but at the same time, Badger recommended they lower their investment guidelines to accommodate the drop in the ARM investments' quality.

21.

Plaintiff would show that they are entitled to reasonable and necessary attorneys' fees.

### THIRD CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY OF ARM CAPITAL ADVISORS, INC.

22.

Plaintiff realleges and adopts by reference all of the allegations of the foregoing paragraphs and further alleges:

23.

Plaintiff would show, as stated above, that a fiduciary relationship existed between Plaintiff and Defendant ARM. Plaintiff and Defendant ARM maintained a confidential relationship which included the reliance on one another to perform as agreed. The breach of the fiduciary duties occurred when Defendant ARM breached its agreement to provide adequate investment management services with respect to the Plaintiff's assets as contemplated. Defendant ARM breached its fiduciary duty to Plaintiff by failing to invest in the proper class and quality of investments as agreed.

24.

Specifically, in this regard, the Statement of Investment Objectives and Guidelines of the Beaumont Fireman's Relief and Retirement Fund stated that the duties and responsibilities of each investment manager retained by the Fund included the following:

> "1.    Managing the assets under its management in accordance with the policy guidelines and objectives expressed herein, or expressed in a separate written agreement when deviation is deemed prudent and desirable.

2.   Exercising full investment discretion (including holding cash and equivalents as an alternative) within the guidelines and objectives stated herein. Such discretion includes decisions to buy, hold or sell securities in amounts and proportions reflective of the manager's current investment strategy and compatible with the investment objectives.

3.   Promptly informing the Fund regarding all significant matters pertaining to the investment of the fund assets, for example:

- substantive changes in investment strategy, portfolio structure and market value of managed assets,

- the manager's progress in meeting the investment objectives set forth in this document, and

- significant changes in the ownership, affiliations, organizational structure, financial condition, professional personnel staffing and clientele of the investment management organization.

4.   Initiating written communication with the Fund whenever the investment manager believes that this Statement of Investment Objectives and Guidelines should be altered. No deviation from guidelines and objectives established in the Statement should occur until after such communication has occurred and the Fund has approved such deviation in writing.

5.   Complying with all laws pertaining to the investment manager's duties and responsibilities as a fiduciary (emphasis added). It is expected that Fund assets will be invested with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent professional investment manger [sic], acting in a like capacity and familiar with such matters, would use in the investment of fund assets."

See Statement of Investment Objectives and Guidelines of the Beaumont Fireman's Relief and Retirement Fund dated December, 1997 and attached hereto as Exhibit "C" and incorporated herein by reference as if fully set forth at length.

25.

The Fixed Income Segment objectives for the Plan were described in the Statement of Investment Objectives and Guidelines as:

- The total fixed-income segment return should rank in the upper 50th percentile compared to the Callan Fixed Income Database measured over a period of five (5) years.

- The individual domestic fixed-income managers total return should perform at least at the upper 40th percentile compared to investment style peers of similar type as found in Callan's Total Domestic Fixed Income Database measured over a minimum period of five (5) years.

- The total fixed-income return should exceed the total return of the Shearson Lehman Government/Corporate Bond Index measured over a period of five (5) years.

See Statement of Investment Objectives and Guidelines, dated November 1994, page 5.

26.

Plaintiff alleges that Defendant ARM invested in securities which were not of the quality required by the Fund and failed to inform the Fund of same as obligated. Upon termination of ARM as a Fund Manager, Plaintiff hired the Bank of New York to liquidate ARM's portfolio. A pertinent part of that report states:

> "... We conducted a competitive bid process in which we attempted to obtain multiple bids on each issue. During this process, our fixed income traders discovered that a large portion of the bonds in the portfolio was illiquid and poor quality. Our fixed income traders experienced difficulty in obtaining multiple bids for specifically eighteen bonds within the Vanderbilt portfolio. (See Table 2) Furthermore, many of the bonds were trading a levels considerably less from levels in which the custodian listed as market value. In some cases, we were not able to obtain any bids. We, first, offered these bonds to Atlanta Capital. They declined on incorporating the bonds in-kind due to their poor quality nature."

See BNY ESI & CO., Inc.'s report attached as Exhibit "D."

## FOURTH CAUSE OF ACTION
## BREACH OF CONTRACT OF ARM CAPITAL ADVISORS, INC.

27.

Plaintiff realleges and adopts by reference all of the allegations of the foregoing paragraphs and further alleges:

28.

Plaintiff would show that Defendant ARM is in violation of their contractual duties, more particularly set forth in the contract attached as Exhibit "B" and set forth in the Statement of Investment Objectives and Guidelines which were in affect during the relevant time period. See Exhibit "C."

29.

Specifically, ARM was to provide asset management services to Plaintiff. ARM did not adequately inform Plaintiff as to its deviation from the plan's investment guidelines or of the poor condition of the assets in which ARM had invested. Plaintiff alleges these acts were in bad faith or, in the alternative, constituted wilful or reckless misconduct or violation of applicable law as herein stated.

30.

As a result of the foregoing, Plaintiff has incurred damages which include, but are not limited to, loss of investment principal, loss of income, and loss of investment opportunity, all of which were a produced result or proximate result of the Defendants' conduct. For these amounts the Plaintiff now sues.

31.

Plaintiff would show that they are entitled to reasonable and necessary attorneys' fees.

Plaintiff's Third Amended Original Complaint - 9

32.

Exhibits A, B, C and D are incorporated herein by reference as if fully set forth at length.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that upon final judgment, Plaintiff have judgment against Defendants, jointly and severally, for their damages in an amount within the jurisdictional limits of the Court, prejudgment and post-judgment interest, costs of court, attorneys fees, punitive damages and for such other and further relief to which Plaintiff may be justly entitled to receive.

Respectfully submitted,

MOORE, LANDREY, L.L.P.
390 Park Street, Suite 500
Beaumont, Texas 77701
(409) 835-3891
(409) 835-2707 FAX

ETHAN L. SHAW
State Bar No. 18140480
JOHN P. COWART
State Bar No. 04919500

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

This certifies that a true and correct copy of the foregoing has been mailed by certified mail, return receipt to Mr. Paul A. Renne / Mr. Charles M. Schaible, Cooley Godward, L.L.P., One Maritime Plaza, 20th Floor, San Francisco, CA 94111; Mr. Philip Werner, Werner & Kerrigan, L.L.P., 1300 Post Oak Blvd., Ste. 2225, Houston, TX 77056; and Mr. Neill C. Kling, Harkins Cunningham, 2600 One Commerce Square, 2005 Market Street, Philadelphia, PA 19103-7042 on this 25 day of July, 2002.

ETHAN L. SHAW

# AFFIDAVIT

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF JEFFERSON | § |

BEFORE ME, the undersigned authority, on this day personally appeared ETHAN L. SHAW, hereinafter referred to as Affiant, who, by me first being duly sworn, does upon his oath depose and say:

"My name is ETHAN L. SHAW. I am an attorney representing the Plaintiff Beaumont Firemen's Relief and Retirement Fund, A Trust Created Under the Texas Local Firefighter's Retirement Act, Article 6243e, Texas Rev. Civ. Stat., in the above styled and numbered cause of action. I am over the age of eighteen (18) years and have personal knowledge of every statement made in this Affidavit, and I am fully competent to testify to the matters herein stated.

I am an attorney licensed to practice law in all of the state courts of the State of Texas. I am employed by the law firm of MOORE, LANDREY, L.L.P.

I certify that the attached exhibits to Plaintiff's Third Amended Original Complaint are true and correct copies.

I further certify that all statements made in the foregoing Third Amended Original Complaint are true and correct to the best of my knowledge and as stated."

Further, Affiant sayeth not.

_____
ETHAN L. SHAW

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, a Notary Public in and for the State of Texas, by the said ETHAN L. SHAW, this the 25 day of July, 2002.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

RENATE JEAN OWENS
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Expires 05-10-2005

# EXHIBIT "A"

# CONTRACT FOR CONSULTING SERVICES

## CALLAN ASSOCIATES INC.

### AND

## BEAUMONT FIREMEN'S RELIEF AND RETIREMENT FUND

This Agreement is made and entered into by and between Callan Associates Inc., a California corporation (hereinafter referred to as Callan), and the Beaumont Firemen's Relief and Retirement Fund (hereinafter referred to as the Fund), to provide independent investment consulting services to the Beaumont Firemen's Relief and Retirement Fund.

## I. SCOPE OF WORK

Callan will provide the following services, prepare the following reports including charts, schedules or other documentation necessary in presenting performance management tools to the Fund.

### A. Performance Analysis

1. Callan will utilize asset and return data prepared by the Plan trustee and others and which are delivered to Callan in industry standard form, content, and layout and will perform portfolio and comparative return analyses. Callan will provide quarterly investment measurement reports and make presentations to appropriate individuals and committees as designated by the Fund, and will participate in regular quarterly performance appraisal meetings with the investment managers appointed by the Fund's office in Beaumont, Texas. This service will be provided for two investment managers. Should more than two investment managers be appointed by the Fund, the performance measurement fee in paragraph V below will be adjusted upward to reflect the additional work required to produce the report.

### B. Investment Manager Controls

1. <u>Investment Manager Liaison:</u> Callan will participate, in regular meetings with investment managers, in the negotiation of fee arrangements with the managers in the development and review of manager contracts. Quarterly, Callan will contrast the performance achieved for the Fund accounts with the composite performance results reported by managers. Callan will assist in the evaluation of requests for changes in guidelines, and performance targets. Callan will assist staff in planning, oversight and review of asset transitions among managers.

2. <u>Managing Managers Reports:</u> Callan will prepare a comparative return report reviewing each manager's performance against the accepted performance target and the market cycle timeline.

## II. CALLAN INVESTMENTS INSTITUTE

The Callan Investments Institute (CII) is a continuing education and research facility in the pension and investments industry. A division of Callan Associates Inc., the Institute was established in 1980 and its membership has steadily grown to over 250 leading corporate, public, endowment/foundation and multi-employer plan sponsor and investment management organizations.

The Fund will be a member of the Institute and will be provided with copies of surveys, research and performance data distributed to institute members. In addition, six individuals will be able to attend both the regional and national conferences at no conference fee. Additional representatives may attend at nominal cost (designed to cover the cost of meals and materials).

## III. TRAVEL AND EXPENSES

The fee covers all travel and expenses to regularly scheduled client meetings in Beaumont, Texas.

## IV. CANCELLATION

The Fund may cancel this Agreement upon ninety (90) calendar days written notice to Callan. The effective date of such notice shall begin three (3) calendar days after date of posting with the United States Postal Service by regular mail, postage prepaid, addressed to the last known address of Callan. The Fund shall pay for the services rendered by Callan to the effective date on a pro rata basis consistent with the fees set forth in paragraph V.

## V. FEES

A. The annual fee for the services referenced in the Scope of Work section is $21,000 and will be billed monthly.

2

B.   Fees in whole or in part may be satisfied at the sole option of the Fund by utilizing brokerage commissions directed to Alpha Management Inc. (hereinafter referred to as Alpha). If Alpha is used for trading, a ratio of two to one (2:00:1) is hereby agreed upon; i.e., $2.00 in commissions satisfies $1.00 of cash fees. Fees may also be satisfied by cash payments. In the event that commissions paid to Alpha exceed an amount equal to 2.00 times the cash fees charged during any calendar quarter, Callan will reimburse back to the Plan, no later than fifteen (15) days after the end of each calendar quarter, an amount equal to fifty (50%) percent of each prior calendar quarter's excess.

C.   Special project fees shall be billed 50% in advance and 50% at completion.

D.   Any additional or specialized consulting services not referenced in Paragraph 1 herein shall be charged to the Fund at Callan's normal rates. Such consulting shall be charged to the Fund in minimum half-day increments with a Senior Consultant billed at $2,000 per day plus expenses and Consulting Support billed at $600 per day plus expenses.

E.   Should any of the data supplied to Callan from any source be in a non industry standard form, content and/or layout requiring Callan to engage in additional and/or non-industry standard work effort, or should the Plan Trustee and other asset custodians be unable to provide a suitable industry standard electronic form content and/or layout of data to Callan, any additional and/or specialized costs incurred by Callan as a result thereof will be charged to the Fund in addition to the fees detailed in Section V of this Agreement.

F.   This contract will be effective April 1, 1994.

## VI.   PAYMENTS

The Fund may make cash payments within a reasonable time after receipt of billing from Callan and/or Alpha. All fees will be payable to Callan and/or Alpha in U.S. dollars, payable from a U.S. based bank or to the financial institution and drawn upon a branch of that bank or institution located within the fifty states or the District of Columbia. Commission payments, if any, are expected to be received by Alpha as part of each individual normal trade settlement process or within 30 days of receipt of monthly billing.

## VII.   PROFESSIONAL CONSULTANT

All performance reports, audits, analysis studies, advisory reports, and evaluation tools will be reviewed, analyzed and presented by a professional Callan consultant to the Fund or its designees at the Fund's offices in Beaumont, Texas.

3

# EXHIBIT "B"

SEP 09 '98 12:20PM ARM CAPITAL ADV. 212-973-2223                          P.2/8

<u>**NON-ERISA A/C's**</u>

# INVESTMENT MANAGEMENT AGREEMENT

AGREEMENT, made as of this _____16th_____ day of _September_ 1996 between
{Name and Address of Organization} (the "Client") and ARM Capital Advisors, Inc. 200 Park
Avenue, New York, NY 10166 (the "Manager").

WHEREAS,



1.    The Client is a _Beaumont Firemen's Relief and Retirement_
with authority to appoint an Investment manager; and

2.    The Client has allocated certain assets to a separate account (account number
_5502050-1393400_ ) (the "Account") maintained with ( _Texas Commerce Bank_ )
(the "Custodian"); and

3.    The Client desires to appoint the Manager to manage the assets now or
hereafter contained in the Account and has directed the Custodian to respond to the investment
instructions of the Manager, and the Manager agrees to serve as investment manager of the
Account.

1

NOW, THEREFORE, the Client and the Manager do hereby agree each with the other as follows:

1.   <u>Appointment and Authority of the Manager</u>.   (a) The Client hereby appoints the Manager as an investment manager with respect to the assets in the Account.  The Manager shall manage the Account with complete discretion in the investment and reinvestment of the assets in the Account in accordance with the Manager's best judgment based on information available to it and the guidelines specified by the Client in writing from time to time, which guidelines may be modified by the Client in writing from time to time.  The Client represents that any written investment guidelines supplied to the Manager, and any written modification of those guidelines shall be, consistent with the investment objectives and limitations of the account.  Lacking any written investment guidelines, the Manager will have full investment discretion.  The Client further agrees that, during the Manager's term of appointment, it shall not make, nor shall it cause to be made, any additions to or withdrawals from the assets in the Account except upon ten days' prior written notice to the Manager.

(b)   Subject to the general limitations of the guidelines specified by the Client, if any, the Manager is authorized, on behalf of the Account, to subscribe for and purchase rights, warrants, or any other debt or equity securities of U.S. issuers offered to U.S. persons in private placements in reliance on Regulation D under the Securities Act.  The Client represents to the Manager that the Plan is an "accredited investor" as such term is defined in Regulation D under the Securities Act.

In connection with any purchase for the Account of securities offered to "accredited investors" in reliance on Regulation D under the Securities Act, the Client authorizes the Manager to:

(i) commit to purchase such securities for the Account on the terms and conditions under which such securities are offered; and

2

(ii) on behalf of the Client, execute such documents, and make such commitments, as may be required by the issuer and/or the seller of such securities, including but not limited to a representation that the Client is an "accredited investor", and a commitment that such securities will not be offered or sold by the Client except in compliance with the registration requirements of the Securities Act or an exemption therefrom.

The Client understands and agrees that the Client shall be bound by the terms of any commitment entered into in connection with the purchase of securities on behalf of the Client pursuant to the authority granted to the Manager pursuant to this Section 1 (b) notwithstanding a subsequent termination of this Agreement by the Manager or the Client.

The authority granted to the Manager pursuant to this Section 1 (b) may be revoked at any time by the Client in writing; provided, however, that any such revocation shall not act as a revocation of authority to purchase securities subscribed for on or prior to the date such revocation is received by the Manager or to execute any required documents and make any required commitments with respect thereto.

(c) The Manager shall determine how to vote all proxies received with respect to securities held in the Account.

2. Custody. All transactions with respect to assets in the Account shall be carried out through the Custodian or such other custodian(s) of the Account as the Client shall appoint in writing. The Manager shall have no responsibilities or liabilities with respect to custody arrangements made by the Client, or to any act, decision or other conduct of any custodian or of any other person having possession of the Client's funds or securities. The Client represents and warrants that it has previously furnished, and will furnish, to the Manager true and complete copies of all agreements and any amendments thereto with any such custodian(s) having possession or custody of assets in the Account.

3

3.   Brokerage.  The Manager shall designate the broker or brokers through whom securities transactions for the Account are executed.  In selecting any such broker, the Manager will consider the experience and skill of the firm's securities traders as well as the firm's financial responsibility and administrative efficiency.  The firms which the Manager designates will generally be firms that, in addition to handling execution, furnish the Manager with research or other services which the Manager may use in providing advice to the Client and other customers.  The Manager will not attempt to limit the use of any such firm as broker to those particular customer accounts which  may benefit from the specific research or other services the firm provides, and thus, the additional services, such as research, provided by a broker executing transactions for the Account may not be utilized for the benefit of the Account.  The Manager will endeavor to secure the best available terms for the Client, with due regard to the quality of research and other services provided by the broker.  The Manager shall not be responsible for any acts or omissions by any broker or brokers, provided that the Manager is not negligent in the selection of such broker or brokers.

4.   Allocation of Investment Opportunities.  The Manager shall not be obligated to purchase or sell for the Account securities which the Manager may purchase or sell for itself or for the portfolios of other clients.  Moreover, the Client acknowledges that circumstances may arise under which the Manager determines that, while it would be both desirable and suitable that a particular security be purchased or sold for the account of more than one of the Manager's portfolios, there is a limited supply or demand for that security.  Under those circumstances, the Client acknowledges that, while the Manager will seek to allocate the opportunity to purchase or sell that security among those portfolios on an equitable basis (including as between portfolios of the Manager's nondiscretionary clients, to whom the Manager makes recommendations, and portfolios of its discretionary clients, such as the Client, with respect to whom the Manager has complete discretion over the assets under its management), the Manager shall not be required to, assure equality of treatment among all of its clients (including that the opportunity to purchase or sell that security will not be proportionally allocated among those portfolios according to any particular or predetermined standards or criteria).

4

5.    Investment Information.  The Account may include securities of companies for which the Manager's ultimate parent company, ARM Financial Group, Inc. has confidential relationships or in which it maintains a position or makes a market.  The Client appreciates that, for good commercial and legal reasons, material nonpublic information which becomes available to the ARM Financial Group, Inc. through these relationships cannot be passed on to the Manager or the Client.

6.    Liability.  The Manager shall assume no responsibility in connection with the performance of its responsibilities under this Agreement for errors of judgment or for other action taken in good faith unless involving gross negligence or willful or reckless misconduct or violation of applicable law.  Nothing herein shall constitute a waiver or limitation of any rights which the Client may have under the federal securities laws of the United States of America or of the rights which may not be waived under any other applicable law.

7.    Termination\Assignment.  This Agreement shall be effective as of September 16, 1996.  It may be terminated by either the Client or the Manager upon 30 days' prior written notice to the other.  Such termination will be effective upon the expiration of such 30 day period subject, however, to the completion of transactions initiated by the Manager prior to receipt of the notice.  No assignment (as such term is defined in the Investment Advisers Act of 1940) of this Agreement shall be made by either party without the consent of the other.

8.    Compensation to Manager.  The Manager shall be entitled to receive as compensation for services rendered a fee determined and paid as described in Appendix A to this Agreement.

9.    Applicable Law.  This Agreement shall be construed in accordance with and be governed by the laws of the State of New York, without giving effect to the conflict of law principles thereof.

5

10.    <u>Notices</u>.  All notices and other written communications specified herein shall be deemed duly given if transmitted by air mail, telecopier to the Manager at 200 Park Avenue, New York, NY 10166, telecopier number (212) 973-2201, and to the Client at { 409-880-1469 }, telecopier number 409-880-1437, or to such other address, telecopier number as shall be specified in a notice duly given.  All notices shall be effective upon receipt.

11.    <u>Client Brochure</u>.  We acknowledge receipt of Manager's current client disclosure brochure, Form ADV Part II.

12.    <u>Separability</u>.  In case one or more of the provisions contained in this Agreement shall be found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

13.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed of the day and year first above written.

ARM CAPITAL ADVISORS, INC.

by: _Robert Macky_

By: _Maurice Sanlefer_
(CLIENT'S NAME)   9/13/96

By: _Beaumont Firemen's Relief and Retirement Fund_

6

# APPENDIX A

## FEE SCHEDULE

## ARM CAPITAL ADVISORS, INC.

.50% on first $10 million

.40% on next $15 million

.30% on next $75 million

.20% on next $100 million

.15% on balance

7

# EXHIBIT "C"

## STATEMENT OF INVESTMENT
## OBJECTIVES AND GUIDELINES


## BEAUMONT FIREMEN'S RELIEF AND RETIREMENT FUND


## NOVEMBER, 1994

## PURPOSE

The purpose of this Statement of Investment Objectives and Guidelines is to assist the Beaumont Firemen's Relief and Retirement Fund (Fund) in more effectively supervising and monitoring the investment of its Retirement Plan assets.

In the various sections of this policy document, the Fund defines its investment program by:

- stating in a written document its attitudes, expectations and objectives in the investment of its assets.

- setting forth an investment "structure" for managing assets. This structure includes various investment management styles that, in aggregate, are expected to produce a sufficient level of diversification and investment return over time.

- providing guidelines for each investment portfolio that control the level of risk assumed in the portfolio and ensure that assets are managed in accordance with stated objectives.

- encouraging effective communication between the Fund and its investment managers.

- establishing criteria to monitor and evaluate the performance results achieved by the investment managers.

This Statement represents the Fund's current philosophy regarding the investment of its assets. In addition, although the Fund shall utilize this Policy Statement in making decisions concerning the Plan, it shall not necessarily be bound solely by its contents.

## INVESTMENT OBJECTIVES AND GUIDELINES

### General Objectives

The primary objective shall be to invest Pension Plan contributions and investment income to assure that there will be no principal erosion of contributed funds or the purchasing power thereof. In making each and all of such investments, the Board shall exercise the judgement and care under circumstances then prevailing which men of ordinary prudence, discretion, and intelligence exercise in the management of their own affairs not in the regard to the permanent disposition of their funds, considered the probable Outside Investment Counselors will be retained to assure that investments are managed in a prudent and professional manner in compliance with applicable State Statutes and other controlling statutes and regulations. The assets of the Fund shall be managed solely in the interests of the Plan participants and beneficiaries. In retaining professional money counselors, it is the intention of the Board of Trustees to give each Investment Counselor full investment discretion with respect to assets under its management.

### Investment Management Structure

The Committee, with assistance of Callan Associates, has reviewed the investment program for the Fund. The result of the review is an updated, long term strategic asset allocation plan.

Initially, four distinct asset classes were considered for inclusion in the portfolio:

| | |
|---|---|
| Domestic Equities | Domestic Fixed Income |
| International Equities | Cash |

After a thorough review a permanent commitment to these four asset classes will be made to ensure diversification at the Plan level.

It is not the intention of the Committee to become involved in day-to-day investment decisions. Therefore, the assets will be allocated to professional investment managers in a manner consistent with the Policy's objectives.

Diversification of the U.S. Market commitment will be achieved through the employment of Balanced managers of complementary investment styles, Growth and Value. In this context, each manager will be responsible for managing both U.S. market equities and fixed income securities. In the International Equity market a diversified non-U.S. manager will be hired and achieve diversification. Cash and cash equivalents will be managed either by the Investment Managers or the custodian.

## Risk Posture

The Fund believes that the assets of the retirement plan should be invested with a risk orientation that is consistent with its ability to assume risk. The Fund defines its risk orientation as:

- a willingness to tolerate some interim fluctuations in market value and rates of return in order to achieve the objectives set forth below; and

- a desire to limit the volatility in the fund's rate of return to a level that is not substantially greater than the average volatility experienced by other U.S. defined benefit retirement plans.

## Investment Objectives

In formulating investment objectives for the Fund assets, primary emphasis is placed on the following general goals:

- Achieving investment results that will accomplish the stated funding objectives for the Fund. Inflation is the key factor driving the cost of retirement programs. The primary function of a retirement plan investment program is to help pay the cost of providing retirement benefits by offsetting the impact of inflation on costs. Therefore, investment performance that exceeds the rate of inflation, thereby providing a real rate of return, will contribute to the proper funding of the Plan.

- Receiving form its investment managers' performance that is above average compared to other managers.

Accordingly, the specific objectives set forth below (and in Appendix A) reflect the above general goals.

## 1.    Total Fund Objectives

As noted in a prior section, the Fund's primary funding objective is to achieve and maintain a funded status that provides for the security of retirement income to participants in the Plan.

All returns for the Fund shall be calculated on a time-weighted, annualized basis for the total portfolio **including** all cash equivalents and STIF. All return data shall include all price changes plus all income and/or dividends. All Investment Managers, Trustees and Consultants shall comply with the most recent Association for Investment Management and Research (AIMR) published standards relative to calculating all investment performance measurements.

3

The following **minimum** comparative objectives have been established for the total Plan:

    A.    Comparative Inflation Coverage Objective:

        The Fund's overall annualized total return (which is defined as all price changes plus all income and/or dividends) should exceed the U.S. Government's Department of Labor Consumer Price Urban Worker Index (CPI-U) measured over a minimum period of five (5) years.

    B.    Comparative Net Return Objective:

        The Fund's overall annualized total return should exceed by at least one and one-half (1½) percentage points per year the return that would have been collectively achieved if the Fund had been fully invested in the Standard and Poor's 500 Stock Index, the MSCI EAFE Index, the Shearson Leahman Government/Corporate Bond Index, and the Callan STIF Database median, calculated relative to the actual collective asset class mix of the Fund measured over a minimum period of five (5) years.

    C.    Comparative Investment Management Objective:

        Over complete capital market cycles (defined as global equity market cycles which are generally five to seven years in length) the Fund's overall annualized total return, should perform at least at the upper 50th percentile compared to: (a) Callan's Total Investment Counselor Databases, (b) Callan's Balanced Manager Database, and (c) Callan's Total Public Plan Sponsor Databases measured over a minimum period of five (5) years.

    D.    Comparative Investment Style Objectives:

        The Fund's overall annualized total return, should perform at least at the upper 40th percentile compared to investment style peers of similar type as found in Callan's Style Databases for each asset class segment measured over a minimum period of five (5) years.

**2.**    <u>**Equity Segment Objectives**</u>

    A.    The following performance goals have been established for the Fund's equity segments:

- The domestic equity segment total return should rank in the upper 50th percentile compared to Callan's Equity Database measured over a period of five (5) years.

- The individual domestic equity managers total return should perform at least at the upper 40th percentile compared to investment style peers of similar type as found in Callan's Total U.S. Equity Database measured over a minimum period of five (5) years.

- The domestic equity segment total return should exceed the total return of the Standard & Poor's 500 Index per year measured over a period of five years.

B.    The following minimum performance goals have been established for the Fund's international equity segment:

- The international equity segment total return should perform at least at the upper 50th percentile compared to Callan's Total Non U.S. Equity Database measured over a minimum period of five (5) years.

- The individual international equity managers total return should perform at least at the upper 40th percentile compared to the investment style peers of similar type as found in Callan's Total Non U.S. Equity Database measured over a minimum period of five (5) years.

- The international equity segment total return should exceed the total return of the Morgan Stanley Capital International Europe, Australia, Far East Index (CIEAFE) over a minimum of five (5) years.

## 3.    **Fixed-Income Segment Objectives**

The following performance goals have been established for the Fund's fixed-income segment of the Fund assets:

- The total fixed-income segment return should rank in the upper 50th percentile compared to the Callan Fixed Income Database measured over a period of five (5) years.

- The individual domestic fixed-income managers total return should perform at least at the upper 40th percentile compared to investment style peers of similar type as found in Callan's Total Domestic Fixed Income Database measured over a minimum period of five (5) years.

- The total fixed-income return should exceed the total return of the Shearson Lehman Government/Corporate Bond Index measured over a period of five (5) years.

**4.**   **Cash and Equivalents Segment Objectives**

Each investment manager who has a Cash Equivalents segment in their portfolio shall be responsible for achieving an above median total return (upper 50th percentile), suing a **ONE** (1) year measurement period, when compared to the Callan Total STIF Database median total return.  This is the sole asset class segment where a one year measurement period supersedes the long-term minimum measurement period of five (5) years.

No idle cash is permitted at any time in any manager's portfolio.  Any idle cash not invested by an investment manager shall be automatically swept up daily into a STIF managed by the trustee or by others in behalf of each investment manager.  All STIF's will be measured for performance to the same standards as are Cash Equivalents.

6

## RESPONSIBILITIES OF THE INVESTMENT MANAGERS

The duties and responsibilities of each investment manager retained by the Fund include:

1.  Managing the assets under its management in accordance with the policy guidelines and objectives expressed herein, or expressed in a separate written agreement when deviation is deemed prudent and desirable.

2.  Exercising full investment discretion (including holding cash and equivalents as an alternative) within the guidelines and objectives stated herein.  Such discretion includes decisions to buy, hold or sell securities in amounts and proportions reflective of the manager's current investment strategy and compatible with the investment objectives.

3.  Promptly informing the Fund regarding all significant matters pertaining to the investment of the fund assets, for example:

    •   substantive changes in investment strategy, portfolio structure and market value of managed assets,

    •   the manager's progress in meeting the investment objectives set forth in this document, and

    •   significant changes in the ownership, affiliations, organizational structure, financial condition, professional personnel staffing and clientele of the investment management organization.

4.  Initiating written communication with the Fund whenever the investment manager believes that this Statement of Investment Objectives and Guidelines should be altered.  No deviation from guidelines and objectives established in the Statement should occur until after such communication has occurred and the Fund has approved such deviation in writing.

5.  Complying with all laws pertaining to the investment manager's duties and responsibilities as a fiduciary.  It is expected that Fund assets will be invested with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent professional investment manger, acting in a like capacity and familiar with such matters, would use in the investment of fund assets.

6.  Acknowledging in writing to the Fund the investment manager's intention to comply with the Statement of Investment Objectives and Guidelines as it currently exists or as modified in the future.

7.      Submitting to the Fund (and its designated consultant) exhibits, written material, etc. that will be used during periodic conferences with the Fund at least ten business days in advance of these conferences.  Please refer to Appendix "A" for a description of the reporting requirements.

8.      The Fund formally delegates full authority to each investment manager for exercising all proxy and related actions of Fund investment assets assigned to it. Each manager shall promptly vote all proxies and related actions in a manner consistent with the long-term interests of the Fund and its Participants and Beneficiaries. Each investment manager shall keep detailed records of all said votings of proxies and related actions and will comply with all regulatory obligations related thereto.  The Fund shall periodically audit and review each investment manager's policies and actions in this area.

9.      Each Balanced investment manager shall insure that its common stock allocation (including convertibles) shall not exceed 50% of its assets under management at book value. There are no restrictions with respect to the fixed income or cash components of the Fund.

10.     Each investment manager shall employ controls which will assure that diversification, marketability, and other guidelines provided in this statement of investment policy shall be followed. Any exceptions shall be communicated to the Board of Trustees for review and discussion at least quarterly.

## EVALUATION AND REVIEW

On a timely basis, but not less than four times a year, the Fund will review actual investment results achieved by each manager (with perspective toward a five-year time horizon) to determine whether:

- the investment managers performed in adherence to the investment philosophy and policy guidelines set forth herein,

- the investment managers performed satisfactorily when compared with:

  - the objectives set forth in Appendix "A", as a primary consideration,

  - their own previously stated investment style,

  - other retirement funds,

  - other investment management, both in asset class and in style group, and

  - market indices.

In addition to reviewing each investment manager's results, the Fund will reevaluate, from time to time, its progress in achieving the total fund, equity, and fixed-income segments objectives previously outlined.  The periodic reevaluation also will involve an evaluation of the continued appropriateness of:  (1) the manager structure set forth in Appendix "A"; (2) the allocation of assets among the managers; and (3) the investment objectives for the Retirement Fund's assets.

## APPENDIX A:  FUND SEGMENT AND INDIVIDUAL MANAGER

## GUIDELINES

## BEAUMONT FIREMEN'S RELIEF AND RETIREMENT FUND

### INVESTMENT STRUCTURE

|                                              | Initial Allocation |
| -------------------------------------------- | ------------------ |
| Balanced Manager Value Orientation           | 42.5%              |
| Balanced Manager Growth Orientation          | 42.5%              |
| International Equity Manager                  | 15.0%              |
|                                              | 100%               |

## 1. __Manager Structure__

The management structure of the Fund will be as illustrated on the previous page. The Fund believes that the established structure:

- is consistent with the practices of other similar sized retirement funds; and

- offers an appropriate blend of investment styles that will produce a sufficient level of diversification and investment return over time.

## 2. __Cash Flow Allocation__

The initial allocation of assets is consistent with the Fund's desire to diversify the Retirement Fund investment management program.

The Fund intends to review on a periodic basis the allocation of assets among its investment managers and shall allocate any material cash flow or other portions of Fund assets as it deems appropriate at its sole discretion.

## 3. __Transaction Agent Assignment Restrictions__

Assignment of specific brokerage firms, dealers, financial institutions, and other transaction execution agents to all investment managers shall be the sole responsibility of the Fund.  From time to time, the Fund at its sole discretion may specify certain transaction agents that investment transactions shall be executed through.

## 4. __Fund Segment Guidelines__

Following are guidelines and objectives established for the fund segments and for each investment manager retained by the Fund.  Individual manager guidelines are designed to be consistent, in aggregate, with the total fund asset allocation guidelines and investment objectives set forth in the Statement of Investment Objectives and Guidelines.

12

## Domestic Equity Segment

Each domestic equity manager is expected to adhere to the following guidelines:

- Equity holdings in any one company and all of its subsidiaries and affiliates (including common stock and convertible securities and debt) should not exceed 5% of the market value of the manager's portion of the Retirement Fund portfolio without the prior written consent of the Fund.

- Equity holdings in any one industry (as defined by Standard & Poor's) should not exceed 20% of the market value of the manager's portion of the Fund portfolio. Equity holdings in any one sector (e.g., consumer cyclical, energy, technology, etc.) should not exceed 30% of the market value of the manager's portfolio without the consent of the Fund.

- There shall be no short selling, securities lending, options trading, use of financial futures or other specialized investment activity without the prior approval of the Fund.

- Liquidity and marketability frequently are perceived to be a function of the quality and the market capitalization of each security holding. From the Fund's perspective, liquidity and marketability also may be a function of a manager's aggregate holdings in a particular security.

- There shall be no non-marketable direct investments in equity or debt private placements, or leasebacks. Stocks eligible for purchase shall be restricted to stocks of companies incorporated within the United States, except for bank stocks and insurance stocks, and are listed upon an exchange registered with the Securities and Exchange Commission or its successors.

- Each Investment Counselor shall monitor portfolio activity to assure that no purchases shall be made which would cause a holding to exceed 5% of the issue outstanding.

- No purchases are authorized in real estate commingled funds, venture capital, international, global, or other investments not specifically authorized by the Board of Trustees and noted in the Investment Policy Guidelines. Investments in pooled funds are permitted if authorized by the Board.

## International Equity Segment

Each international equity manager is expected to adhere to the following **minimum** guidelines:

- Equity holdings in any one company and all of its subsidiaries and affiliates (**including** equities, convertible securities and debt) should not exceed 5% of the market value of the manager's portion of the Fund portfolio without written consent of the Committee.

- Equity holdings in any one industry should not exceed 20% of the market value of the manager's portion of the Fund portfolio. Equity holdings in any one sector (e.g., consumer cyclical, energy, technology, etc.) should not exceed 30% of the market value of the manager's portfolio without the prior written consent of the Committee.

- The manager may enter into foreign exchange contracts on currency provided that: (a) such contracts have a maturity of one year or less, and (b) use of such contracts is limited solely and exclusively to hedging currency exposure existing within the manager's portfolio. The intent is to dampen portfolio volatility and prevent currency loss. There shall be no direct foreign currency speculation or any related investment activity.

- The manager may purchase or sell currency on a spot basis to accommodate specific securities settlements.

- To the extent a commingled vehicle is used for this segment of the Fund, the investment posture of this portion of the Fund will be governed by the prospectus of the commingled vehicle.

## Fixed-Income Segment

Each fixed-income manager is expected to adhere to the following guidelines:

- Bonds held in each portfolio should have a Moody's, Standard & Poor's or Fitch's quality rating of no less than Investment Grade from any of these rating services. (For an issue which is split-rated, the lower quality designation will govern.) Unrated securities of the United States Treasury and government agencies that are backed by the full faith and credit of the U.S. Government are qualified for inclusion in the portfolio.

- The diversification of securities by maturity, quality, sector, coupon and geography is the responsibility of the manager.

- The exposure of each manager's portfolio to any one company and all of its subsidiaries and affiliates including equities, convertible securities and debt, other than securities of the U.S. Treasury and U.S. Government agencies that are backed by the full faith and credit of the U.S. Government should be limited to 10% of the market value of the manager's portion of the Fund portfolio measured at market value.

- The original issue size of at least 90% of the bonds (i.e., 90% of the number of bonds) held in each manager's portion of the Fund portfolio should be $50 million or larger.

14

- There shall be no use of options, financial futures or other specialized investment activity without the prior approval of the Fund.

- Not more than 5% of an investment manager's portfolio, valued at market, shall be invested in certificates of deposit, time deposits, bankers acceptances, commercial paper, or related investments of a single issuer financial institution or financial institution holding company family. All financial institutions selected shall have a "C" or higher rating by Keefe, Bruyette & Woods, a financial institution rating agency.

## Cash Equivalents and STIF Segment

Although investment managers will be retained for their expertise in a certain investment segment of a specific asset class, it is expected that from time-to-time each manager may have some cash equivalents in their portfolios. This may be as a result of normal day-to-day operations or as a result of a discretionary asset allocation decision. Any idle cash not invested by the investment managers shall be invested daily via an automatic sweep STIF managed by the trustee or by others on behalf of each investment manager. It is the Fund's objective to have no idle cash at any time in any manager's portfolios.

- Cash equivalents shall not exceed 50% of the manager's portion of the Fund assets without the prior written consent of the Fund, except for full time, dedicated STIF managers.

- All cash equivalent securities held in each manager's portfolio shall have a Moody's, Standard & Poor's and/or Fitch's overall dollar weighted average credit quality rating or its equivalent of no less than "Single A". (For an issue which is split-rated, the lower quality designation will govern.) Unrated securities of the United States Treasury and United States Government agencies that are backed by full faith and credit of the U.S. Government are qualified for inclusion in the portfolio.

- The exposure of each manager's portfolio to any one company and all of its subsidiaries and affiliates (**including** equities, convertible securities and debt) other than securities of the United States Treasury and United States Government agencies that are backed by the full faith and credit of the U.S. Government should be limited to 10% of the market value of the manager's portion of the Fund portfolio.

- Not more than 5% of an investment manager's portfolio, valued at market, shall be invested in the certificates of deposit, time deposits, banker's acceptances, commercial paper and/or related non equity investments of a single issuer financial institution or financial institution holding company family. All financial institutions selected shall have a "C" or higher rating by Keefe, Bruyette & Woods, a financial institution rating agency.

- Maximum maturities for any individual cash equivalents securities is two (2) years or less. Call dates, put dates, average life dates, rollover dates and related dates are not acceptable for any securities as substitutes for the stated maturity date or for duration calculations.

- Maximum duration for any individual cash equivalents portfolio is one (1) year or less. Call dates, put dates, average life dates, rollover dates and related dates are not acceptable for any securities as substitutes for the stated maturity date or for duration calculations.

5.   **Individual Investment Manager Style Descriptions & Five Year Expectations**

All expectations are minimus. All investment managers should exceed the stated expectations.

| Investment Manager Style Description | Percentile Expectation Ranking Relative to | | Annualized Return Expected Relative To Index |
|---|---|---|---|
| | Other Managers | Style Peers | |
| Balanced Manager Value Orientation | 50th | 40th | S&P 500 - exceed SLGC - exceed |
| Balanced Manager Growth Orientation | 50th | 40th | S&P 500 - exceed SLGC - exceed |
| International Equity Manager | 50th | 40th | CIEAFE - exceed |
| Cash Equivalents and STIF Portfolios (One year expectations only) | 50th | N/A | Callan Associates STIF Database Median |

In addition, each manager is expected to achieve positive risk-adjusted (alpha) performance over a five (5) year period.

A shortfall over a five-quarter period will be examined by the Fund. While the Fund plans to take a long-term view of performance, perceived manager deficiencies will be quickly examined before total fund returns are impacted.

16

### 6.   <u>Reporting Requirements and Measurement Standards</u>

The Fund desires that meetings with its investment managers to review performance results have a consistent agenda. The reason for this is fivefold. First, the Fund wants to make its use of time with the managers more efficient in covering the points that need to be discussed. Secondly, the Fund wants continuity in order to effectively compare and contrast what the managers have articulated with respect to prospective portfolio strategy and tactical decisions vis-a-vis actual portfolio structure and results. Thirdly, the Fund wants to understand how an individual manager's thinking has evolved since the previous meeting and over time.

Investment managers shall receive fifteen (15) business days prior notice on all meeting date requests.

At each meeting, the written, oral, exhibits, and visual presentations shall cover, **at a minimum,** the following points:

- A report of actual performance results for past periods. Standard measurement time periods for each report shall be: last quarter, calendar year-to-date, latest twelve months, two years, five years, four years, etc., and since inception; and by calendar year. All returns shall be calculated on a time-weighted, annualized basis for the total portfolio **including** all cash equivalents and STIF. All return data shall include all price changes plus all income and/or dividends. The Investment Managers, Trustee and Consultant shall comply with the most recent Association of Investment Management and Research (AIMR) standards relative to calculating all investment performance measurements.

- Discussion of the rational for performance results by relating them specifically to investment strategy and tactical decisions implemented during the current review period.

- Official source data on all investment transactions and all market valuations shall be based solely and exclusively on the Trustee's official records. This will eliminate any raw data source variations. All questions shall be arbitrated by the Fund. All decisions shall be final.

- Discussion of the manager's specific strategy and tactical approaches for the portfolio over the next six to twelve months with specific reference to asset allocation, acceptable ranges and industry/sector weightings, if applicable for their style.

- Discussion of the next period's strategy and tactics with reference to the manager's capital market and economic assumptions, if applicable for their style.

- Any other subjects the Fund or the Manager deems appropriate.

Fifteen (15) copies of the written report, evaluations, exhibits, summaries, and visuals shall be received by the Fund at least five (5) business days prior to the meeting.

The Fund shall be using a third party consultant selected, hire and directed by the Fund to: (1) assist in appraising performance, (2) to provide performance comparison data to other retirement plans, several capital market indicates, and to other investment managers, (3) assist in evaluating manager style discipline and peer comparisons, and (4) other factors the Fund deems appropriate. Investment managers are required to support and assist the consultant with their fullest cooperation.

The Fund is interested in fostering an effective working relationship with its managers through a discipline of solid communication. The establishment of Objectives and Guidelines, Performance Goals and Standards, Policies, and Reporting Requirements is intended to provide the Fund with a solid foundation from which to understand specific management styles and strategies, evaluate tactics and results, and oversee progress toward meeting overall Fund general investment goals.

1

**STATEMENT OF INVESTMENT**
**OBJECTIVES AND GUIDELINES**


**BEAUMONT FIREMEN'S RELIEF AND RETIREMENT FUND**


**DECEMBER, 1997**

## PURPOSE

The purpose of this Statement of Investment Objectives and Guidelines is to assist the Beaumont Firemen's Relief and Retirement Fund (Fund) in more effectively supervising and monitoring the investment of its Retirement Plan assets.

In the various sections of this policy document, the Fund defines its investment program by:

- stating in a written document its attitudes, expectations and objectives in the investment of its assets.

- setting forth an investment "structure" for managing assets. This structure includes various investment management styles that, in aggregate, are expected to produce a sufficient level of diversification and investment return over time.

- providing guidelines for each investment portfolio that control the level of risk assumed in the portfolio and ensure that assets are managed in accordance with stated objectives.

- encouraging effective communication between the Fund and its investment managers.

- establishing criteria to monitor and evaluate the performance results achieved by the investment managers.

This Statement represents the Fund's current philosophy regarding the investment of its assets. In addition, although the Fund shall utilize this Policy Statement in making decisions concerning the Plan, it shall not necessarily be bound solely by its contents.

## INVESTMENT OBJECTIVES AND GUIDELINES

### General Objectives

The primary objective shall be to invest Pension Plan contributions and investment income to assure that there will be no principal erosion of contributed funds or the purchasing power thereof. In making each and all of such investments, the Board shall exercise the judgment and care under circumstances then prevailing which men of ordinary prudence, discretion, and intelligence exercise in the management of their own affairs not in the regard to the permanent disposition of their funds, considered the probable Outside Investment Counselors will be retained to assure that investments are managed in a prudent and professional manner in compliance with applicable State Statutes and other controlling statutes and regulations. The assets of the Fund shall be managed solely in the interests of the Plan participants and beneficiaries. In retaining professional money counselors, it is the intention of the Board of Trustees to give each Investment Counselor full investment discretion with respect to assets under its management.

### Investment Management Structure

The Committee, with assistance of Callan Associates, has reviewed the investment program for the Fund. The result of the review is an updated, long term strategic asset allocation plan.

Initially, four distinct asset classes were considered for inclusion in the portfolio:

| | |
|---|---|
| Domestic Equities | Domestic Fixed Income |
| International Equities | Cash |

After a thorough review, a permanent commitment to these four asset classes will be made to ensure diversification at the Plan level.

It is not the intention of the Committee to become involved in day-to-day investment decisions. Therefore, the assets will be allocated to professional investment managers in a manner consistent with the Policy's objectives.

Each asset class will have its own investment managers. Diversification of the U.S. Market Equity commitment will be achieved through the employment of managers of complementary investment styles, Growth and Value. In the U.S. Fixed Income market a core bond manager will be utilized to stabilize the fund. In the International Equity market a diversified non-U.S. manager will be hired to achieve diversification. Cash and cash equivalents will be managed either by the Investment Managers or the custodian.

2

The guidelines for the allocation of assets to investment managers are as follows:

|  | Lower Limit | Normal | Upper Limit |
|---|---|---|---|
| U.S. Market Equities | 45% | 50% | 55% |
| Growth | 22.5% | 25% | 27.5% |
| Value | 22.5% | 25% | 27.5% |
| Core Bond | 30.0% | 35.0% | 40.0% |
| International Equity | 12% | 15% | 18% |

Because the asset classes do not move in concert, deviations from the Normal commitments will occur through normal market activity. The Upper and Lower Limits define the ranges within which market activity will be allowed to shift the allocations. The ranges are designed to allow for a reasonable period of time to elapse before rebalancing the portfolio. Should actual allocations depart from the prescribed ranges, assets will be moved from the over-allocated to the under-allocated.

When in market equilibrium, cash flows will be deployed in a manner that returns the portfolio to its normal commitments.

## Risk Posture

The Fund believes that the assets of the retirement plan should be invested with a risk orientation that is consistent with its ability to assume risk. The Fund defines its risk orientation as:

- a willingness to tolerate some interim fluctuations in market value and rates of return in order to achieve the objectives set forth below; and

- a desire to limit the volatility in the fund's rate of return to a level that is not substantially greater than the average volatility experienced by other U.S. defined benefit retirement plans.

## Investment Objectives

In formulating investment objectives for the Fund assets, primary emphasis is placed on the following general goals:

- Achieving investment results that will accomplish the stated funding objectives for the Fund. Inflation is the key factor driving the cost of retirement programs. The primary function of a retirement plan investment program is to help pay the cost of providing retirement benefits by offsetting the impact of inflation on costs. Therefore,

3

investment performance that exceeds the rate of inflation, thereby providing a real rate of return, will contribute to the proper funding of the Plan.

- Receiving from its investment managers' performance that is above average compared to other managers.

Accordingly, the specific objectives set forth below (and in Appendix A) reflect the above general goals.

1. <u>Total Fund Objectives</u>

As noted in a prior section, the Fund's primary funding objective is to achieve and maintain a funded status that provides for the security of retirement income to participants in the Plan.

All returns for the Fund shall be calculated on a time-weighted, annualized basis for the total portfolio **including** all cash equivalents and STIF. All return data shall include all price changes plus all income and/or dividends. All Investment Managers, Trustees and Consultants shall comply with the most recent Association for Investment Management and Research (AIMR) published standards relative to calculating all investment performance measurements.

The following **minimum** comparative objectives have been established for the total Plan:

A. Comparative Inflation Coverage Objective:

The Fund's overall annualized total return (which is defined as all price changes plus all income and/or dividends) should exceed the U.S. Government's Department of Labor Consumer Price Urban Worker Index (CPI-U) measured over a minimum period of five (5) years.

B. Comparative Net Return Objective:

The Fund's overall annualized total return should exceed by at least one and one-half (1½) percentage points per year the return that would have been collectively achieved if the Fund had been fully invested in the Standard and Poor's 500 Stock Index, the MSCI EAFE Index, the Shearson Lehman Government/Corporate Bond Index, and the Callan STIF Database median, calculated relative to the actual collective asset class mix of the Fund measured over a minimum period of five (5) years.

C. Comparative Investment Management Objective:

> Over complete capital market cycles (defined as global equity market cycles which are generally five to even years in length) the Fund's overall annualized total return, should perform at least at the upper 50th percentile compared to: (a) Callan's Total Investment Counselor Databases, (b) Callan's Balanced Manager Database, and (c) Callan's Total Public Plan Sponsor Databases measured over a minimum period of five (5) years.

D. Comparative Investment Style Objectives:

> The Fund's overall annualized total return, should perform at least at the upper 40th percentile compared to investment style peers of similar type as found in Callan's Style Databases for each asset class segment measured over a minimum period of five (5) years.

## 2. Equity Segment Objectives

A. The following performance goals have been established for the Fund's equity segments:

- The domestic equity segment total return should rank in the upper 50th percentile compared to Callan's Equity Database measured over a period of five (5) years.

- The individual domestic equity managers total return should perform at least at the upper 40th percentile compared to investment style peers of similar type as found in Callan's Total U.S. Equity Database measured over a minimum period of five (5) years.

- The domestic equity segment total return should exceed the total return of the Standard & Poor's 500 Index per year measured over a period of five years.

B. The following minimum performance goals have been established for the Fund's international equity segment:

- The international equity segment total return should perform at least at the upper 50th percentile compared to Callan's Total Non U.S. Equity Database measured over a minimum period of five (5) years.

- The individual international equity managers total return should perform at least at the upper 40th percentile compared to the investment style peers of similar type as found in Callan's Total Non

5

U.S. Equity Database measured over a minimum period of five (5) years.

- The international equity segment total return should exceed the total return of the Morgan Stanley Capital International Europe, Australia, Far East Index (CIEAFE) over a minimum of five (5) years.

## 3. Fixed-Income Segment Objectives

The following performance goals have been established for the Fund's fixed-income segment of the Fund assets:

- The total fixed-income segment return should rank in the upper 50th percentile compared to the Callan Fixed Income Database measured over a period of five (5) years.

- The individual domestic fixed-income managers total return should perform at least at the upper 40th percentile compared to investment style peers of similar type as found in Callan's Total Domestic Fixed Income Database measured over a minimum period of five (5) years.

- The total fixed-income return should exceed the total return of the Shearson Lehman Government/Corporate Bond Index measured over a period of five (5) years.

## 4. Cash and Equivalents Segment Objectives

Each investment manager who has a Cash Equivalents segment in their portfolio shall be responsible for achieving an above median total return (upper 50th percentile), suing a **ONE** (1) year measurement period, when compared to the Callan Total STIF Database median total return. This is the sole asset class segment where a one year measurement period supersedes the long-term minimum measurement period of five (5) years.

No idle cash is permitted at any time in any manager's portfolio. Any idle cash not invested by an investment manager shall be automatically swept up daily into a STIF managed by the trustee or by others in behalf of each investment manager. All STIF's will be measured for performance to the same standards as are Cash Equivalents.

## 5. Responsibilities of the Custodian Bank

The custodian will be responsible for performing the following functions.

- Accept daily instructions from the investment managers;

- Advise investment managers daily of changes in cash equivalent balances;

- Immediately advise investment managers of additions or withdrawals from account;

- Notify investment managers of tenders, rights, fractional shares or other dispositions of holdings;

- Resolve any problems that investment managers may have relating to custodial account;

- Safekeeping of securities;

- Interest and dividend collection;

- Daily cash sweep of idle principal and income cash balance;

- Process all investment manager transactions;

- Provide monthly statements by investment manager account and a consolidated statement of all assets;

- Provide a dedicated account representative to assist in all needs relating to the custody and accountability of the Fund's Assets.

## RESPONSIBILITIES OF THE INVESTMENT MANAGERS

The duties and responsibilities of each investment manager retained by the Fund include:

1.  Managing the assets under its management in accordance with the policy guidelines and objectives expressed herein, or expressed in a separate written agreement when deviation is deemed prudent and desirable.

2.  Exercising full investment discretion (including holding cash and equivalents as an alternative) within the guidelines and objectives stated herein. Such discretion includes decisions to buy, hold or sell securities in amounts and proportions reflective of the manager's current investment strategy and compatible with the investment objectives.

3.  Promptly informing the Fund regarding all significant matters pertaining to the investment of the fund assets, for example:

    • substantive changes in investment strategy, portfolio structure and market value of managed assets,

    • the manager's progress in meeting the investment objectives set forth in this document, and

    • significant changes in the ownership, affiliations, organizational structure, financial condition, professional personnel staffing and clientele of the investment management organization.

4.  Initiating written communication with the Fund whenever the investment manager believes that this Statement of Investment Objectives and Guidelines should be altered. No deviation from guidelines and objectives established in the Statement should occur until after such communication has occurred and the Fund has approved such deviation in writing.

5.  Complying with all laws pertaining to the investment manager's duties and responsibilities as a fiduciary. It is expected that Fund assets will be invested with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent professional investment manger, acting in a like capacity and familiar with such matters, would use in the investment of fund assets.

6.  Acknowledging in writing to the Fund the investment manager's intention to comply with the Statement of Investment Objectives and Guidelines as it currently exists or as modified in the future.

7. Submitting to the Fund (and its designated consultant) exhibits, written material, etc. that will be used during periodic conferences with the Fund at least ten business days in advance of these conferences. Please refer to Appendix "A" for a description of the reporting requirements.

8. The Fund formally delegates full authority to each investment manager for exercising all proxy and related actions of Fund investment assets assigned to it. Each manager shall promptly vote all proxies and related actions in a manner consistent with the long-term interests of the Fund and its Participants and Beneficiaries. Each investment manager shall keep detailed records of all said votings of proxies and related actions and will comply with all regulatory obligations related thereto. The Fund shall periodically audit and review each investment manager's policies and actions in this area.

9. Each investment manager shall employ controls which will assure that diversification, marketability, and other guidelines provided in this statement of investment policy shall be followed. Any exceptions shall be communicated to the Board of Trustees for review and discussion at least quarterly.

## RESPONSIBILITIES OF THE CONSULTANTS

The asset management consultant will be responsible for the following:

- Meet with the Fund on a quarterly basis to discuss aspects of the investment program.

- Provide quarterly performance measurement reports presented by a Callan consultant at the Fund's quarterly meeting.

- Provide database support to answer questions and concerns of the Fund.

- Provide up-to-date information on the investment advisors and custodian employed by the Fund.

- Provide educational resources to the Fund including research papers, conferences, and classes as appropriate.

- **EVALUATION AND REVIEW**

On a timely basis, but not less than four times a year, the Fund will review actual investment results achieved by each manager (with perspective toward a five-year time horizon) to determine whether:

- the investment managers performed in adherence to the investment philosophy and policy guidelines set forth herein,

- the investment managers performed satisfactorily when compared with:

  - the objectives set forth in Appendix "A", as a primary consideration,

  - their own previously stated investment style,

  - other retirement funds,

  - other investment management, both in asset class and in style group, and

  - market indices.

In addition to reviewing each investment manager's results, the Fund will reevaluate, from time to time, its progress in achieving the total fund, equity, and fixed-income segments objectives previously outlined.  The periodic reevaluation also will involve an evaluation of the continued appropriateness of:  (1) the manager structure set forth in Appendix "A"; (2) the allocation of assets among the managers; and (3) the investment objectives for the Retirement Fund's assets.

## APPENDIX A:  FUND SEGMENT AND INDIVIDUAL MANAGER

## GUIDELINES

# BEAUMONT FIREMEN'S RELIEF AND RETIREMENT FUND

## INVESTMENT STRUCTURE

|  | Normal Allocation |
|---|---|
| Domestic Equity Value Orientation | 25% |
| Domestic Equity Growth Orientation | 25% |
| International Equity Manager | 15% |
| Domestic Fixed Income Core Bond Orientation | 35% |
|  | 100% |

12

1.   **Manager Structure**

The management structure of the Fund will be as illustrated on the previous page. The Fund believes that the established structure:

- is consistent with the practices of other similar sized retirement funds; and

- offers an appropriate blend of investment styles that will produce a sufficient level of diversification and investment return over time.

2.   **Cash Flow Allocation**

The initial allocation of assets is consistent with the Fund's desire to diversify the Retirement Fund investment management program.

The Fund intends to review on a periodic basis the allocation of assets among its investment managers and shall allocate any material cash flow or other portions of Fund assets as it deems appropriate at its sole discretion.

3.   **Trustee Utilization Restrictions**

All Plan assets, in any form, shall be solely and exclusively: (a) settled at, (b) held in custody at, and (c) safekept only at custodians designated by the Fund at its sole discretion.

4.   **Transaction Agent Assignment Restrictions**

Assignment of specific brokerage firms, dealers, financial institutions, and other transaction execution agents to all investment managers shall be the sole responsibility of the Fund. From time to time, the Fund at its sole discretion may specify certain transaction agents that investment transactions shall be executed through.

5.   **Short Selling and Related Restrictions**

There shall be no: short selling, securities lending, **non-**collateralized and/or **non-**delivered repurchase agreements, use of financial futues or options, non-marketable direct investments in equity or debt private placements or leasebacks, use of real estate funds or venture capital funds, or any other specialized investment activity without the prior written consent of the Fund.

6.   **Liquidity and Marketability Restrictions**

Liquidity and marketability frequently are perceived to be a function of the quality

and the market capitalization of each security holding. From the Fund's perspective, liquidity and marketability also may be a function of a manager's aggregate holdings in a particular security. The Fund believes that an investment manager should not buy or hold a security for the Fund portfolio if the aggregate holdings among all of that manager's other accounts in that same security would restrict the manager's ability to expeditiously liquidate the position at any time.

From a total Plan perspective, the Fund believes the collective holdings among all Plan managers accounts in that same security would restrict all managers collective ability to expeditiously liquidate their respective positions in that same security. Therefore, the Fund retains the sole right to limit any manager's holding of any security in the Plan at any time in order to prevent the potential for said Plan's collective liquidation and market risk.

**7.** **Usage of Custodian STIF on all Idle Cash Restrictions**

Any idle cash not invested by the investment managers shall be invested daily via an automatic sweep STIF managed by the Custodian or by others in behalf of each investment manager. It is the Fund's objective to have no idle cash at any time in any manager's portfolio.

**8.** **Usage of Cross Asset Segment Investment Guideline Restrictions**

When a manager's holdings include Plan assets outside of their primary assigned asset segment assignment (e.g. A primary domestic equity manager also holds some cash equivalents or fixed income securities as well as equities) the guidelines stated therein for the **non** primary asset segment shall fully apply to the manager, in addition to the primary asset assigned segment guidelines.

**9.** **Diversification Restrictions**

Except for criteria noted elsewhere in this Policy and in specific written contracts with each manager, the appropriate and reasonable diversification of securities by such factors as geography, region, sovereign risk, native currency, quality, coupon, country risk, maturity, industry, duration, and sector is within the full discretion and responsibility of the investment managers.

**10.** **Other Objectives, Guidelines and Restrictions Forthcoming**

The Committee will develop additional objectives, guidelines, and restrictions in the future on other areas as it deems appropriate.

## 11. Fund Segment Guidelines

Following are guidelines and objectives established for the fund segments and for each investment manager retained by the fund. Individual manager guidelines are designed to be consistent, in aggregate, with the total fund asset allocation guidelines and investment objectives set forth in the Statement of Investment Objectives and Guidelines

## 11a. Domestic Equity Segment

Each domestic equity manager is expected to adhere to the following guidelines:

- Equity holdings in any one company and all of its subsidiaries and affiliates (including common stock and convertible securities and debt) should not exceed 5% of the market value of the manager's portion of the Retirement Fund portfolio without the prior written consent of the Fund.

- Equity holdings in any one industry (as defined by Standard & Poor's) should not exceed 20% of the market value of the manager's portion of the Fund portfolio. Equity holdings in any one sector (e.g., consumer cyclical, energy, technology, etc.) should not exceed 30% of the market value of the manager's portfolio without the consent of the Fund.

- Each Investment Counselor shall monitor portfolio activity to assure that no purchases shall be made which would cause a holding to exceed 5% of the issue outstanding.

- Up to 15% of the portfolio may be invested in small cap securities.

## 11b. International Equity Segment

Each international equity manager is expected to adhere to the following **minimum** guidelines:

- Equity holdings in any one company and all of its subsidiaries and affiliates (**including** equities, convertible securities and debt) should not exceed 5% of the market value of the manager's portion of the Fund portfolio without written consent of the Committee.

- Equity holdings in any one industry should not exceed 20% of the market value of the manager's portion of the Fund portfolio. Equity holdings in any one sector (e.g., consumer cyclical, energy, technology, etc.) should not exceed 30% of the market value of the manager's portfolio without the prior written consent of the Committee.

15

- The manager may enter into foreign exchange contracts on currency provided that: (a) such contracts have a maturity of one year or less, and (b) use of such contracts is limited solely and exclusively to hedging currency exposure existing within the manager's portfolio. The intent is to dampen portfolio volatility and prevent currency loss. There shall be no direct foreign currency speculation or any related investment activity.

- The manager may purchase or sell currency on a spot basis to accommodate specific securities settlements.

- To the extent a commingled vehicle is used for this segment of the Fund, the investment posture of this portion of the Fund will be governed by the prospectus of the commingled vehicle.

## 11c.  Fixed-Income Segment

Each fixed-income manager is expected to adhere to the following guidelines:

- All fixed income securities held in each portfolio should have a Moody's, Standard & Poor's or Fitch's quality rating of no less than Investment Grade from any of these rating services. (For an issue which is split-rated, the lower quality designation will govern.)  Unrated securities of the United States Treasury and government agencies that are backed by the full faith and credit of the U.S. Government are qualified for inclusion in the portfolio.

- The diversification of securities by maturity, quality, sector, coupon and geography is the responsibility of the manager.

- The exposure of each manager's portfolio to any one company and all of its subsidiaries and affiliates including equities, convertible securities and debt, other than securities of the U.S. Treasury and U.S. Government agencies that are backed by the full faith and credit of the U.S. Government should be limited to 10% of the market value of the manager's portion of the Fund portfolio measured at market value.

- Not more than 5% of an investment manager's portfolio, valued at market, shall be invested in certificates of deposit, time deposits, bankers acceptances, commercial paper, or related investments of a single issuer financial institution or financial institution holding company family.  All financial institutions selected shall have a

16

"C" or higher rating by Keefe, Bruyette & Woods, a financial institution rating agency.

**12.    Cash Equivalents and STIF Segment**

Although investment managers will be retained for their expertise in a certain investment segment of a specific asset class, it is expected that from time-to-time each manager may have some cash equivalents in their portfolios. This may be as a result of normal day-to-day operations or as a result of a discretionary asset allocation decision. Any idle cash not invested by the investment managers shall be invested daily via an automatic sweep STIF managed by the trustee or by others on behalf of each manager's portfolios.

- Cash equivalents shall not exceed 50% of the manager's portion of the Fund assets without the prior written consent of the Fund, except for full time, dedicated STIF managers.

- All cash equivalent securities held in each manager's portfolio shall have a Moody's, Standard & Poor's and/or Fitch's overall dollar weighted average credit quality rating or its equivalent of no less than "Single A". (For an issue which is split-rated, the lower quality designation will govern.) Unrated securities of the United States Treasury and United States Government agencies that are backed by full faith and credit of the U.S. Government are qualified for inclusion in the portfolio.

- The exposure of each manager's portfolio to any one company and all of its subsidiaries and affiliates (**including** equities, convertible securities and debt) other than securities of the United States Treasury and United States Government agencies that are backed by the full faith and credit of the U.S. Government should be limited to 10% of the market value of the manager's portion of the Fund portfolio.

- Not more than 5% of an investment manager's portfolio, valued at market, shall be invested in the certificates of deposit, time deposits, banker's acceptances, commercial paper and/or related non equity investments of a single issuer financial institution or financial institution holding company family. All financial institutions selected shall have a "C" or higher rating by Keefe, Bruyette & Woods, a financial institution rating agency.

- Maximum maturities for any individual cash equivalents securities is two (2) years or less. Call dates, put dates, average life dates, rollover dates and related dates are <u>not</u> acceptable for <u>any</u> securities as substitutes for the stated maturity date or for duration calculations.

- Maximum duration for any individual cash equivalents portfolio is one (1) year or less. Call dates, put dates, average life dates, rollover dates and related dates are <u>not</u> acceptable for <u>any</u> securities as substitutes for the stated maturity date or for duration calculations.

13. <u>Individual Investment Manager Style Descriptions & Five Year Expectations</u>

All expectations are <u>minimums</u>  All investment managers should <u>exceed</u> the stated expectations.

| Investment Manager Style Description | Percentile Expectation Ranking Relative to | | Annualized Return Expected Relative To Index |
|---|---|---|---|
| | Other Managers | Style Peers | |
| Domestic Equity Valued Orientation | 50th | 40th | S&P 500 - exceed |
| Domestic Equity Growth Orientation | 50th | 40th | S&P 500 - exceed |
| International Equity Manager | 50th | 40th | CIEAFE - exceed |
| Fixed Income Manager Core Bond Orientation | 50th | 40th | SLGC - exceed |
| Cash Equivalents and STIF Portfolios (One year expectations only) | 50th | N/A | Callan Associates STIF Database Median |

In addition, each manager is expected to achieve positive risk-adjusted (alpha) performance over a five (5) year period.

A shortfall over a five-quarter period will be examined by the Fund. While the Fund plans to take a long-term view of performance, perceived manager deficiencies will be quickly examined before total fund returns are impacted.

14. <u>Reporting Requirements and Measurement Standards</u>

The Fund desires that meetings with its investment managers to review performance results have a consistent agenda. The reason for this is fivefold. First, the Fund wants to make its use of time with the managers more efficient in covering the points that need to be discussed. Secondly, the Fund wants continuity in order to effectively compare and contrast what the managers have articulated with respect to prospective portfolio strategy and tactical decisions vis-a-vis actual portfolio structure and results. Thirdly, the Fund wants to understand how an individual manager's thinking has evolved since the previous meeting and over time.

Investment managers shall receive fifteen (15) business days prior notice on all meeting date requests.

At each meeting, the written, oral, exhibits, and visual presentations shall cover, at **a minimum**, the following points:

- A report of actual performance results for past periods. Standard measurement time periods for each report shall be: last quarter, calendar year-to-date, latest twelve months, two years, five years, four years, etc., and since inception; and by calendar year. All returns shall be calculated on a time-weighted, annualized basis for the total portfolio **including** all cash equivalents and STIF. All return data shall include all price changes plus all income and/or dividends. The Investment Managers, Trustee and Consultant shall comply with the most recent Association of Investment Management and Research (AIMR) standards relative to calculating all investment performance measurements.

- Discussion of the rational for performance results by relating them specifically to investment strategy and tactical decisions implemented during the current review period.

- Official source data on all investment transactions and all market valuations shall be based solely and exclusively on the Trustee's official records. This will eliminate any raw data source variations. All questions shall be arbitrated by the Fund. All decisions shall be final.

- Discussion of the manager's specific strategy and tactical approaches for the portfolio over the next six to twelve months with specific reference to asset allocation, acceptable ranges and industry/sector weightings, if applicable for their style.

- Discussion of the next period's strategy and tactics with reference to the manager's capital market and economic assumptions, if applicable for their style.

19

- Any other subjects the Fund or the Manager deems appropriate.

Fifteen (15) copies of the written report, evaluations, exhibits, summaries, and visuals shall be received by the Fund at least five (5) business days prior to the meeting.

The Fund shall be using a third party consultant selected, hire and directed by the Fund to: (1) assist in appraising performance, (2) to provide performance comparison data to other retirement plans, several capital market indicates, and to other investment managers, (3) assist in evaluating manager style discipline and peer comparisons, and (4) other factors the Fund deems appropriate. Investment managers are required to support and assist the consultant with their fullest cooperation.

The Fund is interested in fostering an effective working relationship with its managers through a discipline of solid communication. The establishment of Objectives and Guidelines, Performance Goals and Standards, Policies, and Reporting Requirements is intended to provide the Fund with a solid foundation from which to understand specific management styles and strategies, evaluate tactics and results, and oversee progress toward meeting overall Fund general investment goals.

**STATEMENT OF INVESTMENT
OBJECTIVES AND GUIDELINES**

**BEAUMONT FIREMEN'S RELIEF AND RETIREMENT FUND**

**JULY, 1999**

## PURPOSE

The purpose of this Statement of Investment Objectives and Guidelines is to assist the Beaumont Firemen's Relief and Retirement Fund (Fund) in more effectively supervising and monitoring the investment of its Retirement Plan assets.

In the various sections of this policy document, the Fund defines its investment program by:

- stating in a written document its attitudes, expectations and objectives in the investment of its assets.

- setting forth an investment "structure" for managing assets. This structure includes various investment management styles that, in aggregate, are expected to produce a sufficient level of diversification and investment return over time.

- providing guidelines for each investment portfolio that control the level of risk assumed in the portfolio and ensure that assets are managed in accordance with stated objectives.

- encouraging effective communication between the Fund and its investment managers.

- establishing criteria to monitor and evaluate the performance results achieved by the investment managers.

This Statement represents the Fund's current philosophy regarding the investment of its assets. In addition, although the Fund shall utilize this Policy Statement in making decisions concerning the Plan, it shall not necessarily be bound solely by its contents.

1

## INVESTMENT OBJECTIVES AND GUIDELINES

### General Objectives

The primary objective shall be to invest Pension Plan contributions and investment income to assure that there will be no principal erosion of contributed funds or the purchasing power thereof. In making each and all of such investments, the Board shall exercise the judgment and care under circumstances then prevailing which men of ordinary prudence, discretion, and intelligence exercise in the management of their own affairs not in the regard to the permanent disposition of their funds, considered the probable Outside Investment Counselors will be retained to assure that investments are managed in a prudent and professional manner in compliance with applicable State Statutes and other controlling statutes and regulations. The assets of the Fund shall be managed solely in the interests of the Plan participants and beneficiaries. In retaining professional money counselors, it is the intention of the Board of Trustees to give each Investment Counselor full investment discretion with respect to assets under its management.

### Investment Management Structure

The Committee, with assistance of Callan Associates, has reviewed the investment program for the Fund. The result of the review is an updated, long term strategic asset allocation plan.

Initially, four distinct asset classes were considered for inclusion in the portfolio:

|                        |                      |
|------------------------|----------------------|
| Domestic Equities      | Domestic Fixed Income |
| International Equities  | Cash                 |

After a thorough review, a permanent commitment to these four asset classes will be made to ensure diversification at the Plan level.

It is not the intention of the Committee to become involved in day-to-day investment decisions. Therefore, the assets will be allocated to professional investment managers in a manner consistent with the Policy's objectives.

Each asset class will have its own investment managers. Diversification of the U.S. Market Equity commitment will be achieved through the employment of managers of complementary investment styles, Growth and Value. In the U.S. Fixed Income market a core bond manager will be utilized to stabilize the fund. In the International Equity market a diversified non-U.S. manager will be hired to achieve diversification. Cash and cash equivalents will be managed either by the Investment Managers or the custodian.

2

The guidelines for the allocation of assets to investment managers are as follows:

|  | Lower Limit | Normal | Upper Limit |
|---|---|---|---|
| U.S. Market Equities | 45% | 50% | 55% |
| Growth | 22.5% | 25% | 27.5% |
| Value | 22.5% | 25% | 27.5% |
| Core Bond | 30.0% | 35.0% | 40.0% |
| International Equity | 12% | 15% | 18% |

Because the asset classes do not move in concert, deviations from the Normal commitments will occur through normal market activity. The Upper and Lower Limits define the ranges within which market activity will be allowed to shift the allocations. The ranges are designed to allow for a reasonable period of time to elapse before rebalancing the portfolio. Should actual allocations depart from the prescribed ranges, assets will be moved from the over-allocated to the under-allocated.

When in market equilibrium, cash flows will be deployed in a manner that returns the portfolio to its normal commitments.

## Risk Posture

The Fund believes that the assets of the retirement plan should be invested with a risk orientation that is consistent with its ability to assume risk. The Fund defines its risk orientation as:

- a willingness to tolerate some interim fluctuations in market value and rates of return in order to achieve the objectives set forth below; and

- a desire to limit the volatility in the fund's rate of return to a level that is not substantially greater than the average volatility experienced by other U.S. defined benefit retirement plans.

## Investment Objectives

In formulating investment objectives for the Fund assets, primary emphasis is placed on the following general goals:

- Achieving investment results that will accomplish the stated funding objectives for the Fund. Inflation is the key factor driving the cost of retirement programs. The primary function of a retirement plan investment program is to help pay the cost of providing retirement benefits by offsetting the impact of inflation on costs. Therefore,

3

investment performance that exceeds the rate of inflation, thereby providing a real rate of return, will contribute to the proper funding of the Plan.

- Receiving from its investment managers' performance that is above average compared to other managers.

Accordingly, the specific objectives set forth below (and in Appendix A) reflect the above general goals.

## 1.  Total Fund Objectives

As noted in a prior section, the Fund's primary funding objective is to achieve and maintain a funded status that provides for the security of retirement income to participants in the Plan.

All returns for the Fund shall be calculated on a time-weighted, annualized basis for the total portfolio **including** all cash equivalents and STIF. All return data shall include all price changes plus all income and/or dividends. All Investment Managers, Trustees and Consultants shall comply with the most recent Association for Investment Management and Research (AIMR) published standards relative to calculating all investment performance measurements.

The following **minimum** comparative objectives have been established for the total Plan:

A.  Comparative Inflation Coverage Objective:

The Fund's overall annualized total return (which is defined as all price changes plus all income and/or dividends) should exceed the U.S. Government's Department of Labor Consumer Price Urban Worker Index (CPI-U) measured over a minimum period of five (5) years.

B.  Comparative Net Return Objective:

The Fund's overall annualized total return should exceed by at least one and one-half (1½) percentage points per year the return that would have been collectively achieved if the Fund had been fully invested in the Standard and Poor's 500 Stock Index, the MSCI EAFE Index, the Shearson Lehman Government/Corporate Bond Index, and the Callan STIF Database median, calculated relative to the actual collective asset class mix of the Fund measured over a minimum period of five (5) years.

4

C.   Comparative Investment Management Objective:

Over complete capital market cycles (defined as global equity market cycles which are generally five to seven years in length) the Fund's overall annualized total return, should perform at least at the upper 50th percentile compared to: (a) Callan's Total Investment Counselor Databases, (b) Callan's Balanced Manager Database, and (c) Callan's Total Public Plan Sponsor Databases measured over a minimum period of five (5) years.

D.   Comparative Investment Style Objectives:

The Fund's overall annualized total return, should perform at least at the upper 40th percentile compared to investment style peers of similar type as found in Callan's Style Databases for each asset class segment measured over a minimum period of five (5) years.

2.   **Equity Segment Objectives**

A.   The following performance goals have been established for the Fund's equity segments:

- The domestic equity segment total return should rank in the upper 50th percentile compared to Callan's Equity Database measured over a period of five (5) years.

- The individual domestic equity managers total return should perform at least at the upper 40th percentile compared to investment style peers of similar type as found in Callan's Total U.S. Equity Database measured over a minimum period of five (5) years.

- The domestic equity segment total return should exceed the total return of the Standard & Poor's 500 Index per year measured over a period of five years.

B.   The following minimum performance goals have been established for the Fund's international equity segment:

- The international equity segment total return should perform at least at the upper 50th percentile compared to Callan's Total Non U.S. Equity Database measured over a minimum period of five (5) years.

- The individual international equity managers total return should perform at least at the upper 40th percentile compared to the investment style peers of similar type as found in Callan's Total Non

5

U.S. Equity Database measured over a minimum period of five (5) years.

- The international equity segment total return should exceed the total return of the Morgan Stanley Capital International Europe, Australia, Far East Index (CIEAFE) over a minimum of five (5) years.

## 3. Fixed-Income Segment Objectives

The following performance goals have been established for the Fund's fixed-income segment of the Fund assets:

- The total fixed-income segment return should rank in the upper 50th percentile compared to the Callan Fixed Income Database measured over a period of five (5) years.

- The individual domestic fixed-income managers total return should perform at least at the upper 40th percentile compared to investment style peers of similar type as found in Callan's Total Domestic Fixed Income Database measured over a minimum period of five (5) years.

- The total fixed-income return should exceed the total return of the Shearson Lehman Government/Corporate Bond Index measured over a period of five (5) years.

## 4. Cash and Equivalents Segment Objectives

Each investment manager who has a Cash Equivalents segment in their portfolio shall be responsible for achieving an above median total return (upper 50th percentile), suing a **ONE** (1) year measurement period, when compared to the Callan Total STIF Database median total return. This is the sole asset class segment where a one year measurement period supersedes the long-term minimum measurement period of five (5) years.

No idle cash is permitted at any time in any manager's portfolio. Any idle cash not invested by an investment manager shall be automatically swept up daily into a STIF managed by the trustee or by others in behalf of each investment manager. All STIF's will be measured for performance to the same standards as are Cash Equivalents.

6

## 5.    Responsibilities of the Custodian Bank

The custodian will be responsible for performing the following functions.

- Accept daily instructions from the investment managers;

- Advise investment managers daily of changes in cash equivalent balances;

- Immediately advise investment managers of additions or withdrawals from account;

- Notify investment managers of tenders, rights, fractional shares or other dispositions of holdings;

- Resolve any problems that investment managers may have relating to custodial account;

- Safekeeping of securities;

- Interest and dividend collection;

- Daily cash sweep of idle principal and income cash balance;

- Process all investment manager transactions;

- Provide monthly statements by investment manager account and a consolidated statement of all assets;

- Provide a dedicated account representative to assist in all needs relating to the custody and accountability of the Fund's Assets.

## RESPONSIBILITIES OF THE INVESTMENT MANAGERS

The duties and responsibilities of each investment manager retained by the Fund include:

1. Managing the assets under its management in accordance with the policy guidelines and objectives expressed herein, or expressed in a separate written agreement when deviation is deemed prudent and desirable.

2. Exercising full investment discretion (including holding cash and equivalents as an alternative) within the guidelines and objectives stated herein. Such discretion includes decisions to buy, hold or sell securities in amounts and proportions reflective of the manager's current investment strategy and compatible with the investment objectives.

3. Promptly informing the Fund regarding all significant matters pertaining to the investment of the fund assets, for example:

   • substantive changes in investment strategy, portfolio structure and market value of managed assets,

   • the manager's progress in meeting the investment objectives set forth in this document, and

   • significant changes in the ownership, affiliations, organizational structure, financial condition, professional personnel staffing and clientele of the investment management organization.

4. Initiating written communication with the Fund whenever the investment manager believes that this Statement of Investment Objectives and Guidelines should be altered. No deviation from guidelines and objectives established in the Statement should occur until after such communication has occurred and the Fund has approved such deviation in writing.

5. Complying with all laws pertaining to the investment manager's duties and responsibilities as a fiduciary. It is expected that Fund assets will be invested with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent professional investment manger, acting in a like capacity and familiar with such matters, would use in the investment of fund assets.

6. Acknowledging in writing to the Fund the investment manager's intention to comply with the Statement of Investment Objectives and Guidelines as it currently exists or as modified in the future.

7.  Submitting to the Fund (and its designated consultant) exhibits, written material, etc. that will be used during periodic conferences with the Fund at least ten business days in advance of these conferences.  Please refer to Appendix "A" for a description of the reporting requirements.

8.  The Fund formally delegates full authority to each investment manager for exercising all proxy and related actions of Fund investment assets assigned to it. Each manager shall promptly vote all proxies and related actions in a manner consistent with the long-term interests of the Fund and its Participants and Beneficiaries.  Each investment manager shall keep detailed records of all said votings of proxies and related actions and will comply with all regulatory obligations related thereto.  The Fund shall periodically audit and review each investment manager's policies and actions in this area.

9.  Each investment manager shall employ controls which will assure that diversification, marketability, and other guidelines provided in this statement of investment policy shall be followed.  Any exceptions shall be communicated to the Board of Trustees for review and discussion at least quarterly.

## RESPONSIBILITIES OF THE CONSULTANTS

The asset management consultant will be responsible for the following:

- Meet with the Fund on a quarterly basis to discuss aspects of the investment program.

- Provide quarterly performance measurement reports presented by a Callan consultant at the Fund's quarterly meeting.

- Provide database support to answer questions and concerns of the Fund.

- Provide up-to-date information on the investment advisors and custodian employed by the Fund.

- Provide educational resources to the Fund including research papers, conferences, and classes as appropriate.

## • EVALUATION AND REVIEW

On a timely basis, but not less than four times a year, the Fund will review actual investment results achieved by each manager (with perspective toward a five-year time horizon) to determine whether:

- the investment managers performed in adherence to the investment philosophy and policy guidelines set forth herein,

- the investment managers performed satisfactorily when compared with:

    - the objectives set forth in Appendix "A", as a primary consideration,

    - their own previously stated investment style,

    - other retirement funds,

    - other investment management, both in asset class and in style group, and

    - market indices.

In addition to reviewing each investment manager's results, the Fund will reevaluate, from time to time, its progress in achieving the total fund, equity, and fixed-income segments objectives previously outlined. The periodic reevaluation also will involve an evaluation of the continued appropriateness of: (1) the manager structure set forth in Appendix "A"; (2) the allocation of assets among the managers; and (3) the investment objectives for the Retirement Fund's assets.

10

**APPENDIX A:  FUND SEGMENT AND INDIVIDUAL MANAGER**

**GUIDELINES**

## BEAUMONT FIREMEN'S RELIEF AND RETIREMENT FUND

## INVESTMENT STRUCTURE

|  | Normal Allocation |
|---|---|
| Domestic Equity Value Orientation | 25% |
| Domestic Equity Growth Orientation | 25% |
| International Equity Manager | 15% |
| Domestic Fixed Income Core Bond Orientation | 35% |
|  | 100% |

12

1. **Manager Structure**

   The management structure of the Fund will be as illustrated on the previous page. The Fund believes that the established structure:

   - is consistent with the practices of other similar sized retirement funds; and

   - offers an appropriate blend of investment styles that will produce a sufficient level of diversification and investment return over time.

2. **Cash Flow Allocation**

   The initial allocation of assets is consistent with the Fund's desire to diversify the Retirement Fund investment management program.

   The Fund intends to review on a periodic basis the allocation of assets among its investment managers and shall allocate any material cash flow or other portions of Fund assets as it deems appropriate at its sole discretion.

3. **Trustee Utilization Restrictions**

   All Plan assets, in any form, shall be solely and exclusively: (a) settled at, (b) held in custody at, and (c) safekept only at custodians designated by the Fund at its sole discretion.

4. **Transaction Agent Assignment Restrictions**

   Assignment of specific brokerage firms, dealers, financial institutions, and other transaction execution agents to all investment managers shall be the sole responsibility of the Fund. From time to time, the Fund at its sole discretion may specify certain transaction agents that investment transactions shall be executed through.

5. **Short Selling and Related Restrictions**

   There shall be no: short selling, securities lending, **non-**collateralized and/or **non-**delivered repurchase agreements, use of financial futures or options, non-marketable direct investments in equity or debt private placements or leasebacks, use of real estate funds or venture capital funds, or any other specialized investment activity without the prior written consent of the Fund.

6. **Liquidity and Marketability Restrictions**

   Liquidity and marketability frequently are perceived to be a function of the quality

and the market capitalization of each security holding.  From the Fund's perspective, liquidity and marketability also may be a function of a manager's aggregate holdings in a particular security.  The Fund believes that an investment manager should not buy or hold a security for the Fund portfolio if the aggregate holdings among all of that manager's **other** accounts in that same security would restrict the manager's ability to expeditiously liquidate the position at any time.

From a total Plan perspective, the Fund believes the collective holdings among all Plan managers accounts in that same security would restrict all managers collective ability to expeditiously liquidate their respective positions in that same security. Therefore, the Fund retains the sole right to limit any manager's holding of any security in the Plan at any time in order to prevent the potential for said Plan's collective liquidation and market risk.

7.  **Usage of Custodian STIF on all Idle Cash Restrictions**

Any idle cash not invested by the investment managers shall be invested daily via an automatic sweep STIF managed by the Custodian or by others in behalf of each investment manager.  It is the Fund's objective to have no idle cash at any time in any manager's portfolio.

8.  **Usage of Cross Asset Segment Investment Guideline Restrictions**

When a manager's holdings include Plan assets outside of their primary assigned asset segment assignment (e.g. A primary domestic equity manager also holds some cash equivalents or fixed income securities as well as equities) the guidelines stated therein for the **non** primary asset segment shall fully apply to the manager, in addition to the primary asset assigned segment guidelines.

9.  **Diversification Restrictions**

Except for criteria noted elsewhere in this Policy and in specific written contracts with each manager, the appropriate and reasonable diversification of securities by such factors as geography, region, sovereign risk, native currency, quality, coupon, country risk, maturity, industry, duration, and sector is within the full discretion and responsibility of the investment managers.

10.  **Other Objectives, Guidelines and Restrictions Forthcoming**

The Committee will develop additional objectives, guidelines, and restrictions in the future on other areas as it deems appropriate.

**11.   Fund Segment Guidelines**

Following are guidelines and objectives established for the fund segments and for each investment manager retained by the fund. Individual manager guidelines are designed to be consistent, in aggregate, with the total fund asset allocation guidelines and investment objectives set forth in the <u>Statement of Investment Objectives and Guidelines</u>.

**11a.   Domestic Equity Segment**

Each domestic equity manager is expected to adhere to the following guidelines:

- Equity holdings in any one company and all of its subsidiaries and affiliates (including common stock and convertible securities and debt) should not exceed 5% of the market value of the manager's portion of the Retirement Fund portfolio without the prior written consent of the Fund.

- Equity holdings in any one industry (as defined by Standard & Poor's) should not exceed 20% of the market value of the manager's portion of the Fund portfolio. Equity holdings in any one sector (e.g., consumer cyclical, energy, technology, etc.) should not exceed 30% of the market value of the manager's portfolio without the consent of the Fund.

- Each Investment Counselor shall monitor portfolio activity to assure that no purchases shall be made which would cause a holding to exceed 5% of the issue outstanding.

- Up to 15% of the portfolio may be invested in small cap securities.

**11b.   International Equity Segment**

Each international equity manager is expected to adhere to the following **minimum** guidelines:

- Equity holdings in any one company and all of its subsidiaries and affiliates (**including** equities, convertible securities and debt) should not exceed 5% of the market value of the manager's portion of the Fund portfolio without written consent of the Committee.

- Equity holdings in any one industry should not exceed 20% of the market value of the manager's portion of the Fund portfolio. Equity holdings in any one sector (e.g., consumer cyclical, energy, technology, etc.) should not exceed 30% of the market value of the manager's portfolio without the prior written consent of the Committee.

15

- The manager may enter into foreign exchange contracts on currency provided that: (a) such contracts have a maturity of one year or less, and (b) use of such contracts is limited solely and exclusively to hedging currency exposure existing within the manager's portfolio. The intent is to dampen portfolio volatility and prevent currency loss. There shall be no direct foreign currency speculation or any related investment activity.

- The manager may purchase or sell currency on a spot basis to accommodate specific securities settlements.

- To the extent a commingled vehicle is used for this segment of the Fund, the investment posture of this portion of the Fund will be governed by the prospectus of the commingled vehicle.

### 11c.  Fixed-Income Segment

Each fixed-income manager is expected to adhere to the following guidelines:

- All fixed income securities held in each portfolio should have a Moody's, Standard & Poor's or Fitch's quality rating of no less than Investment Grade from any of these rating services. (For an issue which is split-rated, the higher quality designation will govern.) Unrated securities of the United States Treasury and government agencies that are backed by the full faith and credit of the U.S. Government are qualified for inclusion in the portfolio. Not with standing the above the fixed-income manger may opportunistically invest up to 10% of the portfolio in below investment grade securities.

- The diversification of securities by maturity, quality, sector, coupon and geography is the responsibility of the manager.

- The exposure of each manager's portfolio to any one company and all of its subsidiaries and affiliates including equities, convertible securities and debt, other than securities of the U.S. Treasury and U.S. Government agencies that are backed by the full faith and credit of the U.S. Government should be limited to 10% of the market value of the manager's portion of the Fund portfolio measured at market value.

- Not more than 5% of an investment manager's portfolio, valued at market, shall be invested in certificates of deposit, time deposits, bankers acceptances, commercial paper, or related investments of a single issuer financial institution or financial institution holding company family. All financial institutions selected shall have a

16

"C" or higher rating by Keefe, Bruyette & Woods, a financial institution rating agency.

12. **Cash Equivalents and STIF Segment**

Although investment managers will be retained for their expertise in a certain investment segment of a specific asset class, it is expected that from time-to-time each manager may have some cash equivalents in their portfolios. This may be as a result of normal day-to-day operations or as a result of a discretionary asset allocation decision. Any idle cash not invested by the investment managers shall be invested daily via an automatic sweep STIF managed by the trustee or by others on behalf of each manager's portfolios.

- Cash equivalents shall not exceed 50% of the manager's portion of the Fund assets without the prior written consent of the Fund, except for full time, dedicated STIF managers.

- All cash equivalent securities held in each manager's portfolio shall have a Moody's, Standard & Poor's and/or Fitch's overall dollar weighted average credit quality rating or its equivalent of no less than "Single A". (For an issue which is split-rated, the lower quality designation will govern.) Unrated securities of the United States Treasury and United States Government agencies that are backed by full faith and credit of the U.S. Government are qualified for inclusion in the portfolio.

- The exposure of each manager's portfolio to any one company and all of its subsidiaries and affiliates ( **including** equities, convertible securities and debt) other than securities of the United States Treasury and United States Government agencies that are backed by the full faith and credit of the U.S. Government should be limited to 10% of the market value of the manager's portion of the Fund portfolio.

- Not more than 5% of an investment manager's portfolio, valued at market, shall be invested in the certificates of deposit, time deposits, banker's acceptances, commercial paper and/or related non equity investments of a single issuer financial institution or financial institution holding company family. All financial institutions selected shall have a "C" or higher rating by Keefe, Bruyette & Woods, a financial institution rating agency.

- Maximum maturities for any individual cash equivalents securities is two (2) years or less. Call dates, put dates, average life dates, rollover dates and related dates are not acceptable for any securities as substitutes for the stated maturity date or for duration calculations.

17

- Maximum duration for any individual cash equivalents portfolio is one (1) year or less. Call dates, put dates, average life dates, rollover dates and related dates are not acceptable for any securities as substitutes for the stated maturity date or for duration calculations.

13. **Individual Investment Manager Style Descriptions & Five Year Expectations**

All expectations are minimums. All investment managers should exceed the stated expectations.

| Investment Manager Style Description | Percentile Expectation Ranking Relative to | | Annualized Return Expected Relative To Index |
|---|---|---|---|
| | Other Managers | Style Peers | |
| Domestic Equity Valued Orientation | 50th | 40th | S&P 500 - exceed |
| Domestic Equity Growth Orientation | 50th | 40th | S&P 500 - exceed |
| International Equity Manager | 50th | 40th | CIEAFE - exceed |
| Fixed Income Manager Core Bond Orientation | 50th | 40th | SLGC - exceed |
| Cash Equivalents and STIF Portfolios (One year expectations only) | 50th | N/A | Callan Associates STIF Database Median |

In addition, each manager is expected to achieve positive risk-adjusted (alpha) performance over a five (5) year period.

A shortfall over a five-quarter period will be examined by the Fund. While the Fund plans to take a long-term view of performance, perceived manager deficiencies will be quickly examined before total fund returns are impacted.

14. **Reporting Requirements and Measurement Standards**

The Fund desires that meetings with its investment managers to review performance results have a consistent agenda. The reason for this is fivefold. First, the Fund wants to make its use of time with the managers more efficient in covering the points that need to be discussed. Secondly, the Fund wants continuity in order to effectively compare and contrast what the managers have articulated with respect to prospective portfolio strategy and tactical decisions vis-a-vis actual portfolio structure and results. Thirdly, the Fund wants to understand how an individual manager's thinking has evolved since the previous meeting and over time.

Investment managers shall receive fifteen (15) business days prior notice on all meeting date requests.

At each meeting, the written, oral, exhibits, and visual presentations shall cover, **at a minimum**, the following points:

- A report of actual performance results for past periods. Standard measurement time periods for each report shall be: last quarter, calendar year-to-date, latest twelve months, two years, five years, four years, etc., and since inception; and by calendar year. All returns shall be calculated on a time-weighted, annualized basis for the total portfolio **including** all cash equivalents and STIF. All return data shall include all price changes plus all income and/or dividends. The Investment Managers, Trustee and Consultant shall comply with the most recent Association of Investment Management and Research (AIMR) standards relative to calculating all investment performance measurements.

- Discussion of the rational for performance results by relating them specifically to investment strategy and tactical decisions implemented during the current review period.

- Official source data on all investment transactions and all market valuations shall be based solely and exclusively on the Trustee's official records. This will eliminate any raw data source variations. All questions shall be arbitrated by the Fund. All decisions shall be final.

- Discussion of the manager's specific strategy and tactical approaches for the portfolio over the next six to twelve months with specific reference to asset allocation, acceptable ranges and industry/sector weightings, if applicable for their style.

- Discussion of the next period's strategy and tactics with reference to the manager's capital market and economic assumptions, if applicable for their style.

- Any other subjects the Fund or the Manager deems appropriate.

Fifteen (15) copies of the written report, evaluations, exhibits, summaries, and visuals shall be received by the Fund at least five (5) business days prior to the meeting.

The Fund shall be using a third party consultant selected, hire and directed by the Fund to: (1) assist in appraising performance, (2) to provide performance comparison data to other retirement plans, several capital market indicates, and to other investment managers, (3) assist in evaluating manager style discipline and peer comparisons, and (4) other factors the Fund deems appropriate. Investment managers are required to support and assist the consultant with their fullest cooperation.

The Fund is interested in fostering an effective working relationship with its managers through a discipline of solid communication. The establishment of Objectives and Guidelines, Performance Goals and Standards, Policies, and Reporting Requirements is intended to provide the Fund with a solid foundation from which to understand specific management styles and strategies, evaluate tactics and results, and oversee progress toward meeting overall Fund general investment goals.

# EXHIBIT "D"



BIT RID

FULL VALUE BROKERAGE ℠

BNY ESI & Co., Inc.
A Bank of New York Company

# TRANSITION RECAP AND TRADING COST ANALYSES

## BEAUMONT FIREMEN'S RELIEF & RETIREMENT FUND

**JULY 2000**

Beyond Best Execution....*Full Value Brokerage*℠

# TABLE OF CONTENTS

**SECTION I:**    TRANSITION OBJECTIVES

**SECTION II:**   IMPLEMENTATION STRATEGY

**SECTION III:**  TRADING COST ANALYSES

*Beyond Best Execution...Full Value Brokerage℠*



# SECTION I:

## TRANSITION OBJECTIVES

Beyond Best Execution...*Full Value Brokerage*℠



*Beaumont Firemen's Relief & Retirement Fund*
*Portfolio Restructuring – July-September 2000*

## Objective

# To review, the objective set for BNY ESI is as follows:

| MANDATE | MANAGER | AMOUNT | MANDATE | MANAGER | AMOUNT |
|---------|---------|--------|---------|---------|--------|
| Fully Liquidate | Vanderbilt Capital Advisors | $18,175,774 | Fund New Manager | Atlanta Capital | $18,175,774 |

*\*Based upon unaudited values as provided by Wells Fargo as of 7/14/00*

In effecting this transfer of assets our primary goals were to eliminate unnecessary transactions, to reduce market impact on existing portfolio, and to reduce commission costs.

Beyond Best Execution...*Full Value Brokerage℠*



*Beaumont Firemen's Relief & Retirement Fund*
*Portfolio Restructuring – July-September 2000*

## Summary of Results to Objective

As outlined in the following sections, BNY ESI's transition's process resulted in an efficient liquidation of the Vanderbilt Capital Advisors portfolio to Atlanta Capital. We worked to minimize the market impact and determined the most effective method of transacting your orders to meet the overall objectives of the transition.

The following results were achieved:

- Fourteen fixed income positions were identified as transfer in-kind, saving the Fund approximately $9,638 in commissions and eliminating market impact.

- Commissions on both the liquidation of the Vanderbilt Capital portfolio were greatly discounted from the normal rate for fixed income trades.

- By using various sources of liquidity, we were able to liquidate the Vanderbilt Capital portfolio in the most cost-effective manner possible.



# SECTION II: IMPLEMENTATION STRATEGY

Beyond Best Execution...*Full Value Brokerage*℠



## Implementation

On 7/14/00, we received the certified list of assets held in the Vanderbilt portfolio from Wells Fargo. We, then, submitted the certified sell list to Atlantic Capital so that they could select securities to take in-kind. On 7/18/00 Atlantic Capital confirmed their fixed income requests to transfer in-kind and the custodian was instructed to transfer them to the Atlantic Capital portfolio. There were 14 positions chosen as transfer in-kinds valued at approximately $5,354,342. Thus, saving the Fund about $9,638 in commissions and eliminated potential market impact.

The remaining fixed income trading took place between 7/25/00 – 9/12/00. We conducted a competitive bid process in which we attempted to obtain multiple bids on each issue. During this process, our fixed income traders discovered that a large portion of the bonds in the portfolio was illiquid and poor quality. Our fixed income traders experienced difficulty in obtaining multiple bids for specifically eighteen bonds within the Vanderbilt portfolio. (See Table 2) Furthermore, many of the bonds were trading at levels considerably less from levels in which the custodian listed as market value. In some cases, we were not able to obtain any bids. We, first, offered these bonds to Atlanta Capital. They declined on incorporating the bonds in-kind due to their poor quality nature. With the best execution goal in mind, we enlisted assistance from Vanderbilt Capital to guide our process of obtaining bids for these bonds.

We sold the final bond, on 9/12/00 and raised a total of $11,174,556. We instructed the custodian to move the proceeds from the sales in the Vanderbilt Capital account as the sell trades settled to the Atlanta Capital account.

A cash flow analysis (Table 1), Bonds with Issues (Table 2) and in-kind transfer report (Table 3) follow.



# BEAUMONT FIREMEN'S RELIEF & RETIREMENT FUND

Table 1

| MANAGER | SELLER VANDERBILT | BUYER ATLANTIC CAP |
|---|---|---|
| Bonds (7/14/00) | $ | $ |
| Cash | $ 18,175,774.89 | $ 18,175,774.89 |
| | | |
| FINAL STATUS | $ 18,175,774.89 | $ 18,175,774.89 |
| | | |
| Bonds (7/14/00) | $ 18,061,748.82 | $ 18,061,748.82 |
| Cash (7/19/00) | $ 1,377,162.86 | $ 1,377,162.86 |
| | $ 19,438,911.68 | $ 19,438,911.68 |
| | | |
| Cash (7/19/00) | $ 1,377,162.86 | $ 1,377,162.86 |
| TIK (7/24/00) | $ (5,354,342.00) | $ 5,354,342.00 |
| | | |
| Cash (7/19/00) | $ 1,377,162.86 | |
| | | |
| TRADE DATE 7/25/00 | $ 1,467,960.92 | |
| TRADE DATE 7/26/00 | $ 1,555,760.65 | |
| TRADE DATE 7/28/00 | $ 3,080,563.95 | |
| TRADE DATE 8/03/00 | $ 2,799,519.62 | |
| TRADE DATE 8/08/00 | $ 158,876.00 | |
| TRADE DATE 8/09/00 | $ 598,332.00 | |
| TRADE DATE 8/16/00 | $ 1,018,006.89 | |
| TRADE DATE 8/17/00 | $ 134,613.65 | |
| TRADE DATE 8/22/00 | $ 164,922.50 | |
| TRADE DATE 9/12/00 | $ 196,000.00 | |
| | | |
| Interest Collected July | $ (106,165.46) | $ 106,165.46 |
| Interest Collected August | $ (149,334.33) | $ 149,334.33 |
| Interest Collected September | $ (24,994.11) | $ 24,994.11 |
| | | |
| Tran 7/20/00 | $ (1,377,162.86) | $ 1,377,162.86 |
| Tran 8/02/00 | $ (6,246,703.92) | $ 6,246,703.92 |
| Tran 8/16/00 | $ (521,714.13) | $ 521,714.13 |
| Tran 8/21/00 | $ (3,521,584.93) | $ 3,521,584.93 |
| Tran 8/24/00 | $ (741,270.99) | $ 741,270.99 |
| Tran 8/30/00 | $ (182,592.74) | $ 182,592.74 |
| Tran 9/18/00 | $ (240,298.96) | $ 240,298.96 |
| | $ (560,103.39) | $ 9,311,823.03 |

# BEAUMONT FIREMENS RELIEF FUND- TABLE 2 VANDERBILT PORTFOLIO

## EXPERIENCED TRADING DIFFICULTY ON THE FOLLOWING BONDS

| Cusip | Quantity | Description | Rate(%) | Maturity |
|---|---|---|---|---|
| 030789AM3 | 400,000 | Ames Department Stores Inc. | 10 | 04/15/2006 |
| 036734AA9 | 175,000 | Anthem Insurance Company | 9 | 02/15/2027 |
| 115885AK1 | 140,000 | Browning Ferris | 7.4 | 09/15/1935 |
| 125563AC0 | 450,000 | CIT Cap Trust I | 7.7 | 02/15/2027 |
| 2017IPAA3 | 600,000 | Commercial Linked Asset Structured Notes | | 01/17/1930 |
| 20033WAC2 | 310,000 | Commonwealth Edison Co | 8.5 | 01/15/2027 |
| 26971ZAB1 | 240,000 | Eagle I CBO LTD Ser 144a | 9.57 | 03/15/2030 |
| 52518RA85 | 478,186.18 | Lehman Structured Securities | 6.5 | 11/28/2021 |
| G55356AA0 | 50,000 | Lloyds Bank Fm | | 08/29/2049 |
| 550060AA5 | 350,000 | Lumbermens Mut Cas Co Surplus | 9.15 | 07/01/2026 |
| 55263KAA9 | 405,000 | MBNA Global Capital Services | 7.005 | 02/01/2027 |
| 60036NAB7 | 450,000 | Millennium Amer Inc | 7.625 | 11/15/2026 |
| 66703YAF3 | 200,000 | Northstar CBO LTD | 6.68 | 07/15/2009 |
| 68061 7AA5 | 200,000 | Oleoducto Central - Ser 144A | 9.35 | 09/01/2005 |
| 66937RVW6 | 305,379.70 | Residential Funding Mtg Sec | 6.9974 | 12/25/2027 |
| 760972NE5 | 550,000 | Residential Funding Mtg Sec | 6.74 | 07/01/2026 |
| 7497ZEAK4 | 220,000 | RSL Communications | 9.875 | 02/25/2028 |
| 863572RH8 | 700,000 | Structured Asset Securities | 7 | 12/25/2027 |

# BEAUMONT FIREMEN'S RELIEF & RETIREMENT FUND

**Table 3**  In-Kind Transfers  Vanderbilt Capital to Atlanta Capital

| Cusip | Description | Coupon | Maturity | Par | Market Value |
|---|---|---|---|---|---|
| 3133M7XP6 | FHLB | 5.375 | 03/02/2001 | 620,000 $ | 614,866.40 |
| 3134A3UQ7 | FHLMC | 5.75 | 06/15/2001 | 166,000 $ | 164,496.04 |
| 31359MDN0 | FNMA | 5.625 | 03/15/2001 | 1,248,000 $ | 1,239,026.88 |
| 31359MFJ7 | FNMA | 7.125 | 01/15/1930 | 131,000 $ | 132,412.18 |
| 31359MFP3 | FNMA | 7.25 | 05/15/1930 | 373,000 $ | 383,257.50 |
| 91810DX3 | US TREASURY | 7.5 | 11/15/2016 | 726,000 $ | 829,235.68 |
| 912810EH7 | US TREASURY | 7.875 | 02/15/2021 | 487,000 $ | 585,997.36 |
| 912810FB9 | US TREASURY | 6.125 | 11/15/2027 | 100,000 $ | 101,281.00 |
| 912810FJ2 | US TREASURY | 6.125 | 08/15/2029 | 46,000 $ | 47,344.12 |
| 9128274X7 | US TREASURY | 4.625 | 12/31/2000 | 250,000 $ | 248,047.50 |
| 9128275C2 | US TREASURY | 5 | 02/28/2001 | 300,000 $ | 297,561.00 |
| 9128275S7 | US TREASURY | 5.875 | 11/15/2004 | 380,000 $ | 375,132.20 |
| 9128277254 | US TREASURY | 6.375 | 09/30/2001 | 336,000 $ | 335,684.16 |
|  | TOTAL |  |  | 5,163,000 $ | 5,354,342.02 |

# SECTION III: TRADING COST ANALYSES

Beyond Best Execution...*Full Value Brokerage*℠

